629 A.2d 988

In re MARY KATHRYN T. and Branden T., minors.

**Appeal of THOMAS T. and Barbara T., husband and wife, and Natural Parents.**

In re MARY KATHRYN T. and Branden T., minors.

**Appeal of THOMAS T. and Barbara T., Natural Parents.**

Superior Court of Pennsylvania.

Argued April 14, 1993.

Filed Aug. 9, 1993.

516

Mary S. Ramsden, Pittsburgh, for appellants.

Mark P. Cancilla, Pittsburgh, for appellees.

Cyril C. Vidra, Springdale, for Children and Youth Services, participating party.

Before WIEAND, POPOVICH and HESTER, JJ.

PER CURIAM:

This appeal is from an order which continued custody of two dependent siblings in Allegheny County Children and Youth Services ("CYS") with continued placement at Bradley Center Foster Home,[1] and terminated all visitation between the children and their natural parents. Appellants-parents contend that the court erred in terminating visits, in allowing the children to decide if and when they will visit with their parents, and in allowing the children to remain in their foster home placement. We agree with the parents in all respects, reverse, and remand.

A review of the record in this case compels but one conclusion, which is so clear that we are puzzled how either the trial court or CYS can maintain a contrary position. We will summarize the extensive expert testimony which has been offered through reports and at various hearings. This case evokes and incites great emotion, but our decision is soundly based in the law, which is very clear. Not only are appellants entitled to prove to their children that they have ameliorated conditions in their home life, but they have acknowledged their past wrongdoing and are ready and able to demonstrate that to their children. Moreover, the children's continued placement in Myrna Hagan's foster home is detrimental to any reunification of this family. The trial court was apprised of this fact long ago, at least as early as March, 1990, but unfortunately has refused to act upon it. It is regrettable for the family because it has prevented reunification, and for the children, in particular, for their attachment to their foster mother has grown only stronger, thus making the inevitable separation that much more difficult. However, we have no doubt that it is the result demanded here, the result required by the law.

Appellants-parents, Thomas and Barbara T., have been married for over thirty-five years. Their marriage has produced eleven children who, in 1989, ranged in age from thirty-

---

1. This is Myrna Hagan's foster home which initially was supervised by Alternative Program Associates (APA). Since 1991, it has been supervised by Bradley Center.

one to six years old. Father holds an M.B.A. and works as a computer consultant. Mother is employed as a secretary. On April 16, 1989, Karyl T., then age sixteen, ran away from home and refused to return when apprehended by the police. Karyl alleged that she feared her father because he routinely used excessive physical discipline on her and her siblings. Three younger children lived at home at the time: Pierce, then age eleven, Mary Katherine (Mary Kay), then age ten, and Branden, then age six. Barbara, who was born between Pierce and Karyl, was residing with an older sibling for the summer until she returned to college in the fall.

Karyl[2] was placed in shelter care pending a hearing. On May 3, 1989, a CYS intake worker interviewed Pierce, Mary Kay, and Branden in their home. All three children expressed fear of their father and requested that they be removed from their home. The children were placed in shelter care pending a hearing. Father admitted to a CYS caseworker that he had used physical discipline in the form of paddling and slapping across the face. A caseworker described Father's explanation regarding discipline as follows: "[H]e felt that he needed to 'terrorize' his children into 'listening' to him.... [He] stated that he felt that pain had to be associated with a certain level of misbehavior so that the children would develop an aversion to misbehavior." Reproduced Record at 6a.

Following the removal of the children from the home, they were evaluated by Dr. Susan Nathan of the Family Intervention Center. Pierce, Branden, and Mary Kay complained of being struck by their father with a wooden two by four. Dr. Nathan concluded that the children were victims of chronic emotional and physical abuse, and their home environment had not fostered various age-appropriate developmental goals, such as establishing peer relationships, acquiring positive self-esteem, and expressing and controlling feelings of aggression. Mary Kay and Branden, adjudicated dependent on May 26, 1989, were placed in foster care with Hagan, where they

---

**2.** The record does not reveal what happened to Karyl. The instant case involves only Mary Kay and Branden.

remain today. Pierce, who also was adjudicated dependent, returned home in 1989, where he has remained.

From May until November, 1989, the family received counseling at InterCare with Dr. Donald Hazlett. The children also received individual therapy with Cathy Petchel. Treatment with Dr. Hazlett terminated when Father was discovered tape recording a therapy session which is against Inter-Care's policy.[3] On November 6, 1989, Dr. Kenneth Stanko, a psychiatrist, began treating the family. At a May, 1990 hearing, Dr. Stanko revealed that Father lost his job earlier that year, forcing the family to terminate therapy with Dr. Stanko since Father had assumed the responsibility of paying for the therapy.[4] However, Dr. Stanko continued to monitor mother's use of antidepressant medication.

In August, 1990, the family began treatment with psychologist, Dr. Anna Marie Breaux. Following a review hearing in November, 1990, family therapy continued with Dr. Breaux, while Mary Kay and Branden resumed individual therapy with Cathy Petchel. By August, 1991, CYS changed its service goal from reunification to long-term foster care. During this time, the children attended supervised visits twice per month with their parents and unsupervised visits with various older siblings. In February, 1992, CYS suspended Father's visits with his children; Mother continued to meet them twice per month. Another hearing was held on March 6, 1992, following which parental visitation was reestablished for Father and reduced for Mother to once per month, with increased communication via letters and telephone calls.

The final hearing was held August 19, 1992. At this hearing, Dr. Neil Rosenblum, who had met each of the children

3. Cathy Petchel testified that Father had been instructed not to tape record therapy sessions in keeping with InterCare's policy. She advised that had Father identified his hearing deficit as the basis for doing so, "we certainly would have been flexible in terms of accommodating him." Notes of Testimony ("N.T."), 5/4/90, at 29–30.

4. Appellants also have paid child support to Allegheny County since their children have been in foster care, even when Father was laid off from his job and collecting unemployment. Father paid $247 per month, and Mother paid $262 per month. N.T., 11/2/90, at 58.

alone merely once and each in an interactional session with Hagan, and who never met appellants, testified on behalf of CYS. Dr. Rosenblum recommended that all visits with appellants cease and individual therapy of the children continue. Following this hearing, the court entered the order from which this appeal lies.

We note that the issues regarding reunification of this family, the denial of visitation with the parents, and the continued placement of the children in the home of Myrna Hagan are intertwined. None can be viewed in isolation because the issue concerning the children's placement impacts significantly on the other issues in this case. There is significant and relevant testimony pertaining to these issues at each of the hearings held in this case.

M.C. Henderson, the caseworker assigned to this case since 1989, testified at the May 4, 1990 hearing. During cross-examination, Ms. Henderson admitted that appellants had maintained consistent contact with her and consistently attempted to work toward reunification. N.T., 5/4/90, at 10. She admitted to an antagonistic relationship between Father and foster mother. Ms. Henderson identified inappropriate comments made by foster mother and stated that she had instructed foster mother to refrain from making similar comments in front of the children. Ms. Henderson acknowledged that Pierce had returned home nearly a year before and had not experienced "any excessive physical discipline since his return home." *Id.* at 15. However, Ms. Henderson retained concern for the well-being of the children if they were returned to their home because she believed appellants engaged in psychological and emotional manipulation of Mary Kay and Branden. In support of her belief, Ms. Henderson offered the following example. At Christmas, 1989, appellants and their older children purchased presents for Mary Kay and Branden. Instead of giving the children all of the presents at one time, Mother brought a few presents each time she visited. This shallow and picayune example offered by CYS certainly is not the type of behavior which should have impeded reunification of appellants and their children.

Dr. Robert Saul also testified at the May 4, 1990 hearing. He met only with the children and foster mother. Dr. Saul stated that the children were anxious about the prospect of returning home **because they were afraid that their parents had not changed** and would engage in physical discipline. Dr. Saul's testimony concerning Hagan was revealing. He stated that Hagan "was very adamant in wanting the children to remain with her in the home." *Id.* at 20. Moreover, the foster mother had strong opinions regarding the return of the children to their parents and **questioned whether the parents indeed had changed.** Dr. Saul could not recommend whether the children should be returned home because he had never met the parents and never had seen the children with their parents. However, he noted that he had concerns about the foster mother's strong views concerning the return of the children to their parents and feared "what she might communicate to the children." *Id.* at 22. Dr. Saul also stated that the foster mother's views about the parents "very possibly" would have a detrimental effect on the goal of reunifying the family, and, given that the children had become attached to Hagan, they would be influenced by her even more.

Dr. Kenneth Stanko, a physician who is board certified in adult, child, and adolescent psychiatry, testified at length. At the time of the hearing, Dr. Stanko had seen Branden and Mary Kay for seven sessions, Pierce for seven sessions, and appellants approximately thirty times. The sessions began in November, 1989. Regarding the progress made by appellants, Dr. Stanko stated:

> The one thing I have noted is that Mr. and Mrs. T. have gained an appreciation of both the way that they used to parent their children and how this was not helpful for the children or conducive to their development and good health.

> And they have also—Mr. T. has also gained an appreciation of his personality style, and how that has interfered with him accomplishing his own goals.

*Id.* at 41. Dr. Stanko went on to admit that Father's methods of discipline actually were detrimental to the children's upbringing. Dr. Stanko was consistent and emphatic in his

belief that appellants had worked very hard at changing their behavior and ridding themselves of inappropriate ways of parenting. He stated that they read many books, both those given by him and those they obtained themselves. They underlined relevant portions and sought him out with questions. Most importantly, Dr. Stanko revealed that appellants put this information to use in their parenting of Pierce, who had moved back home without incident.

Dr. Stanko was equally adamant that Hagan, while forming a positive bond with the children, is incapable of fostering a positive relationship between the children and their parents. Dr. Stanko described a meeting he held with appellants and foster mother. Despite the fact that Father believed Hagan harbored negative feelings toward him, he

> still was able to say to her that he thanked her for all that she did do for the children, he appreciated her efforts, of all the positive things that she did for the children, and he had hoped that these sessions would be useful, and he wanted her to be more open with him in terms of cooperating and making this goal possible.

*Id.* at 43. Dr. Stanko testified that when he met with Hagan alone, she told him that she did not believe Father had changed at all. Dr. Stanko emphasized that Hagan's attitude was a serious problem to the stated goal of reunification. At the May 4, 1990 hearing, Dr. Stanko testified with a reasonable degree of medical certainty that placement of the children with Hagan was not conducive to reunification of the family. *Id.* at 47.

The trial court proceeded to preclude testimony by two of the older siblings on this issue, stating that their testimony was irrelevant and subjective. *Id.* at 48–49. However, it is clear that the court was keenly aware of the foster mother's interference with the stated goal of reunification. For example, the court asked the foster home supervisor, "[H]ow are we getting the foster mother under control?", and "What are we going to do about her?" *Id.* at 69. The court went on to state, "The goal is reunification. If there is any interference in that goal, and it's measurable and empirical and contemptu-

ous, then the kids are going to be removed...." *Id.* at 70. Unfortunately, the trial court lost sight of the goal.

As noted above, due to financial limitations when Father became unemployed, appellants were forced to discontinue therapy with Dr. Stanko and began therapy with Dr. Breaux. Dr. Breaux interviewed the children individually, the parents individually, the foster mother individually, and took interactional interviews of all sub-groups: children and parents, children and foster mother, and two children together. At the time of the November 2, 1990 hearing, Dr. Breaux had spent twenty-one and one-quarter hours in direct evaluation.

Dr. Breaux testified at the November 2, 1990 hearing that appellants exhibited "a great degree of motivation to get the family reunited." N.T., 11/2/90, at 13. Moreover, through having Pierce in the home, they were able to prove by their actions what they proclaimed in therapy. *Id.* at 19. Dr. Breaux also testified that the children verbally state one thing but behaviorally indicate another, most significantly concerning their desire to remain in the foster home or return to their parents. For example, although the children professed a fear of Father, their interaction with him did not indicate fear. Dr. Breaux testified, "They have been very comfortable with verbal interactions and comfortable with physical touch. There is no real fear at all." *Id.* at 18.

The crux of the problem, according to the psychologist, was the children's belief that they had to choose between their foster mother, Hagan, and their parents. Dr. Breaux stated that Hagan is competitive with appellants rather than being neutral to the relationship with their children. She stated that foster mother redirected the children's concerns to parallel her own. For example, Mary Kay told Dr. Breaux that she wanted to skip the next therapy session (when her parents would be present) because she wanted to accompany Hagan and her son on a trip to the zoo. At the end of the session, when Mary Kay was leaving, Hagan prompted the child with, "Didn't you have concerns about contact with your dad?" *Id.* at 19. At that point, Mary Kay stated that fear of her father was the real reason she wanted to skip the next session.

524

In her report [5], Dr. Breaux noted the following with regard to Myrna Hagan:

Overall, Myrna appears to be a loving person who has provided the children with structure and nurturance. However, her destain [sic] for their biological parents is likely to exacerbate the reunification process. This open dislike of the children's parents occurs despite previous attempts to have Myrna take a more neutral attitude.

. . . .

The placement of Mary Kay and Branden with Ms. Hagan has had a mixed effect. . . . [S]he has failed to facilitate the goal of family reunification. . . . . Despite repeated attempts by case workers to alter this attitude, it still remains. . . .

. . . .

In his case, however, I have concerns that the foster mother would become increasingly competitive, leading to more distress for the children.

. . . .

I strongly believe that the children are being done a disservice by continued placement with Myrna Hagan.

Reproduced Record (R.R.) at 60a–70a. Dr. Breaux testified that there is no likelihood of reunifying this family as long as the children remain in the Hagan foster home. N.T., 11/2/90, at 20. Thus, she recommended either that the children return

5. Appellees have objected to the inclusion and exclusion of items in the reproduced record without identifying them specifically. They generally assert that portions of transcripts were omitted, in addition to "numerous pieces of correspondence and material which was never presented to the lower court, let alone entered into evidence." Brief of Child Advocate at 10. While the October, 1990 report of Dr. Breaux was not specifically entered into evidence, Dr. Breaux clearly testified from her report and in fact, was directed by the trial court to summarize it. See N.T., 11/2/90, at 6. Moreover, the child advocate and CYS cross-examined Dr. Breaux on the report. In fact, the court took a recess specifically to allow the child advocate to review the report. It is clear that all parties had the report, including the trial court, Dr. Breaux was subjected to lengthy cross-examination, the report was utilized for the basis of the doctor's testimony, and the trial court considered it.

to their parents' home immediately or move to a different foster home [6] closer to their family and friends.

Despite acknowledging the competitiveness and manipulation of foster mother and that "competent expert testimony" established that the children and parents should be reunited, the trial court refused to follow Dr. Breaux's recommendation. *Id.* at 42, 46. Instead, the trial court ordered that the children remain with Hagan, receive individual therapy, and continue visitation with appellants.

By report dated January 29, 1991, Dr. Breaux updated the court concerning therapy. In the preceding three months, Dr. Breaux engaged in an additional twenty-two hours of direct contact with the family. The children's behavior regressed, and Dr. Breaux opined that it may be a response to the fact that the children observed her testimony at the November, 1990 hearing. Dr. Breaux also advised the court that appellants had been given limited opportunity to demonstrate their improved parenting style, and that the conflict between foster mother and appellants continued to complicate the goal of reunification. Dr. Breaux opined that "the foster mother has explicitly and implicitly taken actions leading to the children's alienation towards their parents." R.R. at 107a. In her summary and recommendations, Dr. Breaux concluded:

Therapy has been a struggle between being responsive to [the children's] concerns and not reinforcing their inappropriate behavior. This therapist feels that the source of their inappropriate behavior is multifactorial, including:

1. Distress over unsupervised visits with their parents, due to the lack of a firm parent-child bond.

2. Manipulativeness, for which they believe they will be rewarded.

3. A disproportionate hatred for neutral actions of the parents which are perceived as negative. This alienation

6. Appellants reside in Bethel Park, while the foster home is located in Squirrel Hill. Dr. Breaux testified that moving the children to a foster home within their home school district would allow for an easier transition when the children are placed with their parents.

has been perpetuated by direct and indirect statements from the foster mother.

*Id.*

A hearing was held on March 6, 1992. The hearing was held, rather than review by addendum, because CYS recommended terminating all visitation with appellants, and the psychologists, Dr. Breaux and Cathy Petchel, did not concur. *Id.* at 16. M.C. Henderson, the CYS caseworker, testified that visits with the family were stopped temporarily due to the children's acting-out behaviors. While Mary Kay's behavior escalated, she did not pose a safety risk. Branden, however, was the focus of the hearing. Appellants' counsel asked Ms. Henderson if she believed Father would cooperate in leaving the visitation session if asked to do so. The witness replied, "I believe that he would. I haven't found him to be unwilling to adhere to suggestions that I have made." N.T., 3/6/92, at 8–9. Ms. Henderson stated that appellants had been cooperative; the problem really was in the children's perceptions of appellants' actions. Dr. Breaux specifically was asked if she favored suspending visitation for Branden. The doctor replied, "No. I think the problem with that is, by the process the children have learned is that if you escalate your behavior enough, you can get things to happen, and I think that would be the likely outcome of that." *Id.* at 19–20. The trial court then ordered visitation a minimum of once per month plus regular telephone contact.

The final hearing took place on August 19, 1992. Dr. Breaux recommended that family visits occur a minimum of once per week with additional contact by telephone and letters. CYS also presented testimony of Dr. Neil Rosenblum. Dr. Rosenblum had met once with each child individually and once in an interactional session with the children and foster mother. Based upon these two sessions, April 9, and April 14, 1992, Dr. Rosenblum testified that all visitation between the children and appellants be terminated because the children are stressed by such contact. He stated that Branden, especially, is destroying property at school and engaging in abu-

sive behavior there, significantly at times when he meets his parents.

Dr. Rosenblum admitted that his recommendation could change if he met with appellants, noting, "I'm admitting from the very beginning that I've only heard two sides of the story, the children's and the foster mother's." N.T., 8/19/92, at 34. Moreover, he acknowledged, in response to questioning concerning the fact that he had limited information regarding this case, "The more information you have, the better grounds that would be your conclusions as to what's causing the behavior." *Id.* at 37. Dr. Rosenblum reviewed Dr. Breaux's report but called her only once to attempt discussion. Significantly, he never contacted Cathy Petchel, the children's therapist.

Dr. Rosenblum stated that Mary Kay was very anxious to please Hagan in addition to others. *Id.* at 44. Further, he testified that the children's relationship with their parents suffered because the parents had not acknowledged any wrongdoing. When apprised by appellants' counsel that Father indeed had admitted his wrongdoing to his children, Dr. Rosenblum replied, "That is the type of information that, if I had been able to have conduct [sic] an interactional, that's exactly the type of information that I would have been able to obtain." *Id.* at 46. In fact, a review of Dr. Rosenblum's testimony consistently reveals an incomplete and inaccurate basis for his recommendations regarding this family.

Based only on this testimony, the trial court ordered the termination of all visits between the children and parents. The order of August 19, 1992, states:

Children remain at Bradley Center Foster Home. CYS to make immediate referral to WPIC for individual therapy for the children, family therapy for the parents and children, and for an Intensive Case Manager to coordinate the treatment. Visits to resume at any time upon requests of the children and/or a time the Court deems appropriate pursuant to the law.

The propriety of the court's decision that Mary Kay and Branden are dependent children first declared in 1989 never

has been challenged. Parents, especially Father, who was the active disciplinarian, acknowledged from the beginning that the family needed help and that his methods of discipline were detrimental to his children. It is clear that appellants have worked diligently and consistently to solve their problems, and it appears they have been successful. Indeed, there is nothing in the record that allows for any other conclusion. All of the testimony establishes that the only reason the parents and children remain apart is because the children profess continued fear of returning to their parents' home. The wedge that has reinforced the continued separation is Myrna Hagan.

This is not a case where the parents are unwilling or unable to rectify the conditions which led to the children's removal by CYS. Our docket is full of such cases; time and again we address the plentiful, pitiful situations. There is not an iota of testimony herein that appellants have failed to correct their inappropriate and detrimental parenting style. Moreover, they have had the opportunity to prove it by having Pierce in the home.

The expert testimony in this case is significant, both in quantity and quality. For over three years, every psychologist or psychiatrist who treated this family said the same thing: the parents acknowledged their wrongdoing, have worked very hard to rectify it, and have proved themselves in their care of Pierce, but they were prevented from reunification with Mary Kay and Branden due solely to the efforts of the foster mother and her influence over them. Nearly every six months, the trial court was apprised of these facts by the ever-changing faces before it, and the court continued to ignore it. The effects of Hagan easily can be measured. One need only assess the escalating misbehavior of the children as they continued to be separated from their family. The longer Hagan influenced these children, the fewer the visits between the children and their parents, and the more the children acted out.

While ignoring all of this testimony which resulted from hours and hours of therapy over a period of years, the trial court relied upon the testimony of Dr. Rosenblum who saw the

children twice, once with the foster mother and never with appellants. He recommended that all visits with the parents cease. The trial court then, based only on this admittedly incomplete information, incredulously terminated all visits with the parents. The law does not support such a result.

If a child is removed from his parents upon a clear showing of necessity, the parents have an affirmative duty to work toward reunification. *In re Baby Boy P.*, 333 Pa.Super. 462, 482 A.2d 660 (1984), citing *In re Interest of C.M.E.*, 301 Pa.Super. 579, 586, 448 A.2d 59, 63 (1982). Furthermore, one of the primary purposes of the Juvenile Act, 42 Pa.C.S. §§ 6301 *et seq.*, is to preserve the unity of the family whenever possible. *In re Interest of M.B.*, 388 Pa.Super. 381, 565 A.2d 804 (1989); 42 Pa.C.S. § 6302.

It is clear that natural parents, even when they have lost custody of their children, should be awarded visitation "except in fairly extreme circumstances." *In re Long*, 313 Pa.Super. 47, 51, 459 A.2d 403, 405 (1983). We have described the gravity of the loss threatened when a child is declared dependent and removed from the natural parents' home:

> [H]ere the state has not merely assumed legal custody of Cheryl Ann but has further attenuated familial bonds by preventing parental visitation. Such a radical disruption of the familial relationship not only imposes upon Appellants a prolonged, indefinite loss of a particularly important private interest [4] but also may well precipitate Appellants' permanent loss of parental rights through the formal dissolution of the family.[5]

---

[4] Augmenting the likelihood of a permanent severing of the parent-child relationship is the tendency of the young child to form attachments with those in the child's life "whose presence has been the most continuous and stable," i.e., the foster family, and the reluctance of the court to disrupt such attachments. *In re Tremayne Quame Idress R.*, 286 Pa.Super. 480, 495, 429 A.2d 40, 48 (1981).

[5] Section 2–31–72 of the new regulations governing Foster Family Care Service for Children states that the "agency with custody [of the child] shall request the court to terminate parental rights when a determination has been made that it will be impossible for the child to return home within a reasonable period of time."

*In Interest of Rhine,* 310 Pa.Super. 275, 282–83, 456 A.2d 608, 612 (1983) (other footnotes omitted). "Unless the state demonstrates with clear and convincing evidence that even supervised visitation would severely endanger the child, the court must deny the complete foreclosure of parental visitation as being contrary to the Act's goal of family preservation." *Id.,* 310 Pa.Super. at 286, 456 A.2d at 614. "Visitation ... has been limited or denied only where a parent has been shown to suffer from severe mental or moral deficiencies that constituted a grave threat to the child!" *In re Long, supra,* 313 Pa.Super. at 51–52, 459 A.2d at 405. Further, a child's desire not to visit with a parent is not sufficient reason to deny visitation. *Nancy E.M. v. Kenneth D.M.,* 316 Pa.Super. 351, 462 A.2d 1386 (1983).

*In re Interest of Rhine, supra,* presented a similar situation to the instant case. Cheryl Ann Rhine was declared a dependant child. Based upon the child's behavior following visits with her parents, the parents' final visit with her occurred on January 24, 1980. The trial court did not issue an explicit order denying visitation until January 21, 1981. We held in *Rhine,* "that, consistent with the [Juvenile] Act's 'clear necessity' custody test, parents whose visitation is opposed by the state constitute a grave threat to their child only where there are no practicable visitation options that permit visitation and protect the child." *Id.* 310 Pa.Super. at 285–86, 456 A.2d at 614. The *Rhine* Court went on to analyze the testimony of the five hearings in the case and determined that the aggregate evidence "did not rise to the level of clear and convincing, *competent* evidence of a grave threat to Cheryl Ann." *Id.,* 310 Pa.Super. at 298, 456 A.2d at 620 (emphasis in original) (footnote omitted).

We already have analyzed the testimony from the hearings in the instant case. The *only* evidence that supports the conclusion that visitation with appellants poses a grave threat to Mary Kay and Branden is the testimony of Dr. Rosenblum at the August 19, 1992 hearing, and it is not *competent* evidence upon which such a determination can be based. Dr. Rosenblum met twice with the children, once in

conjunction with the foster mother. This is in contrast to the hours and hours of therapy over the course of years with Dr. Stanko and Dr. Breaux. *Compare In re E.F.V.*, 315 Pa.Super. 246, 461 A.2d 1263 (1983) (superior court affirmed termination of visitation with natural parents where child had been brutally beaten in first seven weeks of her life, foster parents had thoroughly cooperated with reunification efforts, and all of the conditions which led to the abuse of the child continued to exist).

Accordingly, the August 19, 1992, order terminating visitation with appellants is reversed. We remand to the Court of Common Pleas of Allegheny County to hold an expedited hearing to determine whether the children may be returned forthwith to their parents' home. If they may not be placed in their parents' home forthwith, placement shall be made in a foster home in close proximity to appellants, preferably in the same school district. Visitation with parents is to be re-established in accordance with a plan to reunify appellants with their children with utmost dispatch. Jurisdiction is relinquished.