729 A.2d 89 (1999)
In re C.J., D.O.B. 1/20/86, R.J., D.O.B. 6/19/88, R.J., II, D.O.B. 3/21/90, C.J., D.O.B. 4/9/92, A.J., D.O.B. 3/21/94, M.J., D.O.B. 12/7/96.
Appeal of R.J., Father.
Appeal of D.J., Mother.
Superior Court of Pennsylvania.
Submitted February 22, 1999.
Filed April 23, 1999.
*91 Cindy L. Calarie, Kittanning, for R.J., appellant.
Stephanie J. McFadden, Kittanning, for D.J., appellant.
Paula C. Lastrapes, Kittanning, for appellees.
James A. Favero, Kittanning, for Armstrong County Children and Youth Services, participating party.
Before CAVANAUGH, JOHNSON, JJ., and CIRILLO, President Judge Emeritus.
*90 CIRILLO, President Judge Emeritus:
¶ 1 This is a child dependency case in which incarcerated parents, R.J. and D.J., have appealed from the Juvenile Court's decision to limit but not discontinue visitation with their six children, all in foster care. We affirm.
¶ 2 In May of 1997, the Armstrong County Department of Children and Youth Services (CYS) filed a petition in the Court of Common Pleas requesting that the six minor children of D.J. and R.J. be declared dependent pursuant to the Juvenile Act, 42 Pa.C.S. § 6301 et seq. CYS represented that various reports over the course of the previous year had alleged that each child had either committed criminal sexual conduct in the home,[1] or had been medically neglected and/or physically abused by their parents.[2] Attempted in-home services had been discontinued five months previously due to the parents' hostility and non-cooperation. Finally, the parents had both been arrested on the date the petition was filed and were incarcerated awaiting trial, causing the children to be without supervision.[3] Therefore, the children had been removed by the police and placed in temporary foster care. The court approved the arrangement, added provisions for CYS's receipt of records, and ordered psychological evaluations of the two allegedly delinquent children. Parents then stipulated that the children were all dependent due to neglect and/or "discipline" and consented to CYS taking temporary custody of their children. The court simultaneously ordered psychological counseling for four children, evaluation of both parents, and supervised visitation.
¶ 3 The six children were placed in four different foster homes, one of which is outside the county.[4] During the parents' initial confinement in the nearby county prison while awaiting trial, joint visits with all children and both parents were held twice a month at the Armstrong County jail in Kittanning. Thereafter, the parents were convicted, sentenced, and transferred to distant state correctional institutions *92 (SCI's); understandably, visits began occurring less frequently. Mother's location is approximately two and one-half hours' drive, one-way, from the children; father's location is two and one-half hours from the children, but in the opposite direction.[5]
¶ 4 Three months after the parents were sentenced, CYS filed its motion to limit visitation. Citing 55 Pa.Code section 3130.68(a)(3),[6] the motion noted that CYS was required to schedule visits between the parents and children at least once every two weeks, unless otherwise ordered in the children's best interests. Although the family service plan goal remained reunification, the motion noted that biweekly visits by the children to the parents' SCI locations were impractical and not in the children's best interests, given the distance between parents and children and the special medical needs of two of the children. Therefore, CYS requested that the court order a reduction in frequency of visitation to once every quarter (plus any other times the parents might be returned to the county for any reason, with one week's notice to CYS to coordinate a visit). It also asked the court to mandate that visits be held with both parents in the Armstrong County jail, thus requiring parents and not children to travel. The petition averred that such a change would be in the children's best interests.
¶ 5 The trial court held a hearing three months later, at which parents, children, and CYS were represented. Detailed testimony was taken from the treating psychologist for two of the children, the therapist for two others, and the CYS caseworker for all six throughout the case's duration. Parents also testified. The following day, the trial court issued an order granting CYS's motion and limiting visitation to once every six months, to be held in the Armstrong County jail (in Kittaning) at the same time as the dependency review hearings required under 42 Pa.C.S. section 6351. Simultaneously, the court issued a three-page memorandum briefly explaining its rationale.
¶ 6 One question is presented for our review: "Did the [trial] court err in limiting visitation between incarcerated parents and their six children to times when the parents are in Kittanning for court proceedings?"
¶ 7 In child dependency matters, we must accept the facts as found by the trial court unless they are not supported by the record. In the Interest of M.B., 449 Pa.Super. 507, 674 A.2d 702, 704 (1996), (quoting In the Matter of Luis R., 430 Pa.Super. 518, 635 A.2d 170 (1993)). Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. In re Donna W., 325 Pa.Super. 39, 472 A.2d 635 (1984) (en banc). We review for abuse of discretion. Wiseman v. Wall, 718 A.2d 844, 847 (Pa.Super.1998). Our scope of review, accordingly, is of the broadest possible nature. Id. See also In re Read, 693 A.2d 607, 610 (Pa.Super.1997).
¶ 8 The trial court has provided us with a memorandum of findings that it issued concurrently with the order herein appealed. That document sets forth the following findings in addition to those recited above. Four of the six children are in therapy. Their two therapists testified *93 that it would not be in their best interests to visit their parents at the remote SCI locations. The CYS caseworker for all six children testified that previous visitations with the parents had been chaotic, given the children's limited attention spans and special needs. During prior visitation with parents:
The children fought with each other (sometimes physically) and on at least one occasion a child acted out sexually with an older sibling. All of the children have physical and/or emotional problems. Close and constant supervision would be required on any trips to be made.
For these reasons, the CYS case worker testified that, in her opinion, it would not be in the children's best interests to make the long trips that would be necessary for visitation at the SCI locations. The trial court found these facts and professional opinions fully supported and agreed with them. It wisely opined: "We think it would be extremely difficult for the children to endure such lengthy trips given their physical and emotional conditions." Thus, the trial court declined to order visitation at the SCI locations. These findings and conclusions of the trial court are amply supported by the evidence.
¶ 9 The more controversial aspect of the trial court's memorandum is the following statement:
A suggestion was made that the Sheriff transport the parents to Kittanning for visitation sessions. This we will not do. The parents are state prisoners confined in state institutions. If we were to transport these prisoners hundreds of miles to visit their children, we would be setting a precedent for all state prisoners to be transported for the purpose of visiting their families. Such a policy would create chaos in the prison system, not to mention the tremendous expense of time and money in transporting prisoners across the state.
This Court maintains review hearings every six months as required by law. The parents are present for these court proceedings and are transported for that purpose. Visitations can be arranged while the parents are present for these hearings.
¶ 10 As appellees have pointed out, there is very little case law regarding reduction (or even regarding outright denial) of visits of incarcerated parents with their dependent children in foster care. Additionally, the distinction between the right to visitation, and who must pay for the attendant expenses of visitation, has not been explored in the context of imprisoned parents.
¶ 11 One of the primary purposes of the Juvenile Act, 42 Pa.C.S. §§ 6301 et seq., is to preserve the unity of the family whenever possible. In re Mary Kathryn T., 427 Pa.Super. 515, 629 A.2d 988, 995 (1993) (citation omitted). There is, however, no statute providing specific guidance to the courts in evaluating frequency of parental visitation once children have been adjudicated dependent. M.B., supra at 706 n. 3. CYS, nonetheless, is bound by the following administrative regulation, which reads in pertinent part:
Visiting and communication policies
(a) The county agency shall provide opportunity for visits between the child and parents as frequently as possible but no less frequently than once every 2 weeks at a time and place convenient to the parties and in a location that will permit natural interaction, unless visiting is:
(1) Clearly not in keeping with the placement goalfor example, in adoption or independent living.
(2) Freely refused in writing by the parents.
(3) Not in the child's best interest and is limited or prohibited by court order.
(b) Except in a circumstance in which the county agency has reason to suspect that a child is at risk of abuse as defined in Chapter 3490 (relating to child protective *94 services-child abuse), the county agency may not reduce the opportunity for visitation between parents and their child in placement to less than once every 2 weeks without prior court approval of the reduction.
55 Pa.Code § 3130.68 (emphasis added). Thus, CYS must adhere to a "best interest" standard when petitioning the court for approval before it may reduce parental visitation. It has done so here.
¶ 12 We do not find this regulation binds us, however. Administrative rules may be classified as either interpretative or legislative. Commonwealth v. DePasquale, 509 Pa. 183, 186-87, 501 A.2d 626, 628 (1985). In that case, our supreme court quoted the following succinct explanation of the distinction:
[R]ules have force of law when issued pursuant to a grant of legislative power to make law through rules. The conclusion, very solidly based, is that rules are legislative when the agency is exercising delegated power to make law through rules, and rules are interpretive when the agency is not exercising such delegated power in issuing them.

* * * *
When a rule is issued pursuant to delegated power, the court is bound by it as if it were a statute, and the court can do no more than inquire into its validity. But when a rule is not issued pursuant to delegated power, the court's inquiry is not into validity but is into correctness or propriety; the court may substitute judgment to whatever extent it finds desirable.
Id. at 187, 501 A.2d at 628-29 (quoting K.C. Davis, 2 Administrative Law Treatise § 7:10 at 54, § 7:13 at 59 (2d ed.1979)). Applying this analysis, the rules are clearly internal, or interpretive, and bind only CYS. The "best interest" standard quoted in the regulation must only be met by CYS; the regulation does not set a standard for the court order that CYS must procure. Since the regulation is of the interpretative rather than the legislative type, we are not bound by it.
¶ 13 Case law, however, does establish two different standards potentially applicable to the context of parental visitation with dependent children. This profusion of standards has caused some confusion among the parties, which is understandable. A review of the published cases will reveal a periodic re-appearance of a similar confusion. The conflict between the various standards, the preceding regulation, and the procedure followed herein is at the heart of this appeal.[7]
¶ 14 The polestar and paramount concern in evaluating parental visitation, in dependency as well as non-dependency situations, is the best interests and welfare of the children. Albright v. Commonwealth ex rel. Fetters, 491 Pa. 320, 323, 421 A.2d 157, 158 (1980); M.B., supra at 705 (citing In re Long, 313 Pa.Super. 47, 459 A.2d 403 (1983)). "Once a child is adjudicated dependent, the issues of custody and continuation of foster care are determined according to a child's best interests." In re J.S.W., 438 Pa.Super. 46, 651 A.2d 167, 169 (1994). Thus, it has been said that "[t]he sole concerns of a court called upon to enforce a parent's right of visitation are the welfare and best interests of the child." Niadna v. Niadna, 343 Pa.Super. 298, 494 A.2d 856, 858 (1985).
¶ 15 However, because of the constitutionally protected liberty interest parents have to such visitation, parental visitation is usually not denied or limited unless visitation with the parent poses a grave threat to the child. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Green v. Sneeringer, *95 431 Pa.Super. 66, 635 A.2d 1074, 1075 (1993); M.B., supra at 705 (discussing Rhine, supra). In fact:
It has long been the law in this Commonwealth that "only when the evidence clearly shows that [parents] are unfit to associate with [their] children should [they] be denied the right to see them." Commonwealth ex rel. Turner v. Strange, 179 Pa.Super. 83, 86, 115 A.2d 885, 886 (1955). See also In re Damon B., [314 Pa.Super. 391, 460 A.2d 1196 (1983)]; In Interest of Rhine, 310 Pa.Super. 275, 283, 456 A.2d 608, 613 (1983) ("Visitation has been limited or denied only where the parent has been shown to suffer from severe mental or moral deficiencies that constitute a grave threat to the child."); In re Mary Kathryn T., 427 Pa.Super. 515, 629 A.2d 988 (1993); In re Adoption of Michael J.C., 326 Pa.Super. 143, 473 A.2d 1021 (1984).
M.B., supra at 706 (Cavanaugh, J., dissenting).
¶ 16 In dependency cases such as this, the standard against which visitation is measured also depends upon the goal mandated in the family service plan.[8] Where, as here, reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat. M.B., supra; Damon B., supra at 1198. If, however, the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the child or children. Damon B. The "best interests" standard, in this context, is less protective of parents' visitation rights than the "grave threat" standard.
¶ 17 It is clear that the grave threat standard applies to this case, for the goal of the family service plan remains reunification.[9] "In rare instances, however, we have approved restricting or temporarily suspending visitation even though there has been no showing of such severe mental or moral deficiencies in the parent as would constitute a grave threat to the child's welfare." Id.
¶ 18 Damon B., supra, presented us with such a rare case. Therein, the "grave threat" standard, as here, may be said to have conflicted with the "best interest" standard. We were there presented with an order reducing a non-incarcerated mother's visitation with her son from twice a month to once every quarter. Less than a year after his birth, Damon B. and his six siblings had been adjudicated dependent due to unsanitary conditions in the home. Although efforts were made through CYS to return the children and address the home situation, they were unsuccessful, and Damon was quickly placed with foster parents. Three years later, his foster parents filed a notice of intention to adopt, although visitation was still occurring twice a month and the family service plan goal remained reunification. After a hearing, the trial court found that mother had improved her housekeeping and parenting skills and was adequately parenting the two children who had been returned to her. However, it also found that because of Damon's strong psychological bond with his new family, if he were to be returned to mother, serious emotional harm would result. The trial court thus ordered CYS to change its permanency plan from reunification of the family to a different goal, and reduced visitation to once every three *96 months. Id. at 1197-98. Mother appealed.
¶ 19 On appeal, this court found the trial court had erred. That court had reduced visitation but had found specifically that mother had no severe mental or moral deficiencies which would constitute a grave threat to the child. After examining the two potential standards, we clarified that the grave threat standard applied. However, we affirmed, for we found the visits had been counterproductive and had caused the child extreme emotional stress, including physical symptoms. We thus implied that a grave threat existed, albeit not attributable to any present deficiency of mother.[10] We relied particularly upon the fact that the order was a temporary one; we also reversed as erroneous the trial court's direction to CYS to change its family service plan goal. Id. at 1198-99.
¶ 20 In Green, supra, we were presented with another such "rare case" in which the trial judge had applied the improper "best interest" standard. As in Damon B., we had before us more than sufficient facts of record to uphold the denial of visitation under the "grave threat" standard:
Where a father engages in the premeditated killing of the mother of his infant child, a forteriori he possesses a moral deficiency constituting a grave threat to the child.... Barring criminal acts committed upon the child, we can think of no action in which a parent could engage posing a graver threat to a child's welfare than killing the other parent.
Green, supra at 1077.
¶ 21 As in Damon B., the order restricting parents' visitation herein is temporary, and the family service plan goal remains reunification. It is also clear that the trial court in this case, as in that one, applied a "best interest" standard, rather than the correct standard that visitation may only be reduced if there is a "grave threat" to the children. Regardless, as in those cases, it is clear that, given the two visitation locations available, one of them is unacceptable; extreme stress would occur if the children were to be ordered to visit the parents in their SCI locations, and this would amount to a grave threat to them. There is ample evidence to this effect, as well as a fully supported finding by the trial court. We, therefore, affirm the portion of the order regarding transportation to the parents' SCI locations.
¶ 22 We have before us no finding under either the "grave threat" or the "best interest" standard regarding visitation in the Armstrong County prison. Nonetheless, there is ample evidence of record for us to find that supervised visitation in that location would not pose a grave threat to the children. There is no finding on the record that the parents are unfit to see their children. In fact, the psychologists and the CYS caseworker testified uniformly that they were in favor of continuing visitation with parents, and that it would be in the children's best interests. Their concerns were based upon either the location of visits, or the difficulties associated with the children traveling to parents' locations.
¶ 23 As the trial court has aptly observed, however, there is a difference between the right of the parents to visitation, and the matter of who pays for the transportation and other arrangements. Although parents may have the right to visit, their ability to do so is a matter of their *97 own volition. Had they not chosen to commit the criminal offense(s) they did, their ability to visit would be governed by different circumstances. The fact that they chose to commit these crimes is what has led to their present inability to visit. This is not attributable to anyone or anything but themselves.
¶ 24 The state has no obligation to transport these or any other parents to visitation with their children. The trial court's point regarding expense to the state is most certainly correct. See Sullivan v. Shaw, 437 Pa.Super. 534, 650 A.2d 882, 884-85 (1994) (limiting rights of prisoners to attend hearings regarding visitation with their children).[11]
¶ 25 Order affirmed.
¶ 26 CAVANAUGH, J. concurs in the result.
NOTES
[1] The victim was an unrelated ten-year-old girl. Two of the children were adjudicated delinquent based on this conduct.
[2] Some of these reports had already been found "indicated" when the petition was filed, while some were still under investigation.
[3] It appears the charges were in some manner related to the children and their dependency. One record petition alleges that the charges were based on an incident in which parents had attempted to rape an in-home nurse who had been providing care to one of the minor children with extensive medical needs. A different petition states there were multiple "nursing professionals" victimized. However, there is no further record indication of parents' charges, convictions, or sentences.
[4] The record indicates that this location was chosen based on the special medical needs of the child placed there.
[5] Mother is currently located at the State Correctional Institution (SCI) at Cambridge Springs, after having been transferred from SCI Muncy. Father is located at SCI Houtzdale, after having been transferred from SCI Camp Hill.
[6] The Public Welfare Code, 55 Pa.Code § 3130, Administration of County Children and Youth Social Service Programs, "parallels and supplements the Juvenile Act, sections 6361-6365, the Child Protective Services Law, 11 P.S. sections 2201-2224, and the Adoption Act, 23 Pa.C.S. section 2511 et seq." In re J.P., 393 Pa.Super. 1, 573 A.2d 1057, 1065 (1990).
[7] Another minor source of confusion in the briefs has been the attempt to apply non-dependency custody cases to the present controversy. These do not apply and must be sharply distinguished except as expressions of the most general policy.
[8] Further standards prevail in other aspects of dependency proceedings under the Juvenile Act. Children who have been adjudicated dependent may not be separated from their parents unless evidence is presented showing that such a separation is clearly necessary. In the Interests of S.S., 438 Pa.Super. 62, 651 A.2d 174, 176 (1994). Termination of parental rights, and placement for foster care, is conducted under the standard of clear and convincing evidence. Id. at 177. The fact that these standards are not "best interests" has caused confusion in the past. Id. See also Pa.R.C.P.1915.1 et seq. for further rules regarding visitation.
[9] We are without power to review the appropriateness of this goal. See discussion infra of Damon B., supra.
[10] Our review of the law convinces us that prior to the case of Damon B., the standard had been limited to severe parental moral or mental deficiencies causing a grave threat, and it is often still so recited. See, e.g., M.B., supra at 706 (Cavanaugh, J., dissenting). However, since 1983, the standard has, as in Damon B., sometimes been phrased thus: "As a usual rule, parental visitation is not denied except where a grave threat to the child can be shown." M.B., supra at 705. Due to the continued recital of both versions of the standard, our law is not clear if a grave threat caused by something or someone other than the parents would meet the standard.
[11] The issue of parents' ability to reimburse the state and/or county correctional systems for transportation to and from Armstrong County's jail was not before the court. See Sullivan, supra at 885.