J-S15018-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.M.-D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 17 WDA 2021 |

Appeal from the Order Entered December 10, 2020
In the Court of Common Pleas of Blair County Civil Division
at No:  CP-07-DP-0000009-2019

BEFORE:   LAZARUS, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.:                   **FILED:  August 6, 2021**

A.M. (Mother) appeals from the order changing the permanency goal from reunification to adoption with respect to her daughter, B.M.-D. (Child). Upon careful review, we affirm.

Child is 15 years old, having been born in June of 2006.  In December 2018, when Child was 12, Mother voluntarily placed Child in the home of D.N., the future mother-in-law of Child's adult sister.  Trial Court Opinion, 1/20/21, at 8.  The placement was the result of Child's allegation that on Thanksgiving of 2018, Mother struck Child in the face, causing pain and a nosebleed.  *Id.* at 8, 11.  Child also alleged that Mother had a history of hitting her, and she was afraid to be around Mother.  *Id.* at 8.  Child did not want to see Mother

_____

[*] Retired Senior Judge assigned to the Superior Court.

at all.  *Id.* at 11.  At the time, Child's adult sister was not yet married, but lived with D.N.'s son and D.N. in D.N.'s home.  *Id.*

Blair County Children, Youth and Families (CYF) initiated an investigation concerning Child's allegations of abuse, and on February 21, 2019, the trial court adjudicated Child dependent.  The following month, Mother was indicated as a perpetrator of child abuse with respect to the Thanksgiving incident.  *Id.* at 13; N.T., 10/8/20, at 79.

The court initially determined Child's permanency goal was reunification, and directed Mother to participate in a "global assessment," which included interaction with Child; parenting classes; mental health services; individual counseling; and anger management.  Aside from the interactional component of the global assessment, the court directed Mother to have no contact with Child.

The court thereafter conducted regular permanency review hearings.  *See* Trial Court Opinion, 1/20/21, at 13-21 (discussing hearing chronology and details).  During each permanency hearing, the evidence demonstrated Child did not want contact with Mother.

The court appointed Terry O'Hara, Ph.D., to provide recommendations for treatment, placement, and permanency planning.  Dr. O'Hara evaluated Mother and Child on two occasions.  Dr. O'Hara recommended a therapeutic process to assist Mother and Child in rebuilding their relationship.  Thereafter, the court's permanency review order dated May 14, 2020 provided Mother

and Child, at Child's discretion, to have contact in the community or by telephone.

Child had been in placement for approximately two years at the time of the permanency review hearing on October 8 and November 19, 2020, where CYF requested that Child's goal be changed to adoption. CYF presented the testimony of Leslie Turner, of Impact Counseling Services, who was Mother's therapist; Layla Hendricks, Child's outpatient, trauma-focused, cognitive behavioral therapist; Beverly Moss Oswalt, the facilitator of the "Circle of Security Parenting" program in which Mother participated; and Melissa Stump, CYF caseworker. Child and Mother testified remotely. The trial court detailed the testimonial evidence in its opinion. *See* Trial Court Opinion, 1/20/21, at 22-31.

At the conclusion of evidence, counsel presented closing arguments, which included the guardian *ad litem* (GAL) advocating for goal change to adoption based on Child's strong desire. The trial court then stated on the record that it was changing Child's permanency goal to adoption. N.T., 11/19/20, at 57-60. The court memorialized its decision by order dated December 10, 2020. In the order, the court found Child's visitation with Mother to be contrary to Child's well-being, stating, "it has been previously determined that a visitation schedule with her mother would be therapeutically detrimental, which was again confirmed through the testimony of both [Child] and her individual trauma therapist, Layla Hendricks, during the most recent hearing." Order, 12/10/20, at ¶ 24.

On December 23, 2020, Mother filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court issued its Rule 1925(a) opinion on January 20, 2021.

Mother presents two questions for review:

1. Whether the [trial] [c]ourt erred/abused its discretion by changing the goal to adoption when the record showed that [M]other participated in all services and was compliant with [CYF]'s requests?

2. Whether the [trial] [c]ourt erred/abused its discretion by failing to specifically order visitation between [M]other and [C]hild, which actively hindered the previous goal of return home?

Mother's Brief at 4.[1]

At the outset, we recognize:

In cases involving a court's order changing the placement goal . . . to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008) (citations omitted). However, we are mindful that "[w]hen the trial court's findings are supported

---

[1] Child's GAL has joined CYF's appellee brief in support of affirmance.

by competent evidence of record, we will affirm even if the record could also support an opposite result." ***In re N.C.***, 909 A.2d 818, 823 (Pa. Super. 2006).

This Court has stated:

Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act [42 Pa.C.S.A. §§ 6301-6365], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

***Id.*** (italics in original, citations and footnotes omitted).

Section 6351(f) of the Juvenile Act sets forth considerations for the trial court in deciding a child's permanency goal:

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

. . .

(f.1) ADDITIONAL DETERMINATION.-- Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

. . .

42 Pa.C.S.A. § 6351(f)(1)-(6); 42 Pa.C.S.A. § 6351(f.1)(1)-(2).

The best interests of the child, and not the interests of the parent, must guide the trial court. *In re S.B.*, 943 A.2d at 978. Further, there is no minimum period of time that a child's goal must be reunification before it may be changed. *In re M.S.*, 980 A.2d 612 (Pa. Super. 2009). This Court has held that "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re*

***N.C.***, 909 A.2d at 824 (quoting ***In re Adoption of M.E.P.,*** 825 A.2d 1266, 1276 (Pa. Super. 2003)).

Mother first argues the evidence was insufficient to show that the goal change was in Child's best interests. Mother bases her argument on her compliance with the permanency plan. This argument is not persuasive.

It is undisputed that Mother has complied with the treatment recommendations of Dr. O'Hara, which was required by the permanency plan. N.T., 10/8/20, at 88-89. However, the court expressly found Mother has not demonstrated "the consistency of completing milestones necessary to provide [Child] the assurances of safety and security for her well-being in order for her to return home." Trial Court Opinion 1/20/21, at 40.

Mother's therapist, Leslie Turner, testified to working with Mother for approximately two years on anger management, decision-making skills, and issues related to "families in perpetual crisis." N.T., 10/8/20, at 5. Ms. Turner testified that Mother suffers "a lot of family drama. There's a lot of fighting. There's a lot of disengagement. . . . There's a lot of trauma. This goes back probably I would say at least three decades from [Mother]'s immediate family to her current situation [regarding Child]." ***Id.*** at 6. Ms. Turner testified that Mother needs treatment from a trauma therapist because of what Mother suffered in her own childhood. ***Id.*** at 7, 11-12. She stated Mother's first trauma therapy appointment was scheduled for the afternoon of October 8, 2020. ***Id.*** at 15. Ms. Turner explained "the trauma component [of Mother's

treatment] is important because that has impacted a lot of her functioning and decisions." *Id.* at 12. She testified that a symptom of Mother's trauma is "a fight or flight sort of reactive decision and that's where [Mother] sometimes gets herself in trouble." *Id.* Ms. Turner opined:

> I think [Mother] cycles. So I think there's times that she does better than others, and there's times that she will reach out to me and discuss some of the decision-making skills that we've talked about that she is trying to use. **But this is a hard process. I'm not going to sit here and say that this is going to be easy for Mother to change fully. This has been ingrained. This is going to take a lot of work.**

*Id.* at 7 (emphasis added). Ms. Turner emphasized that Mother "is [in]vested in doing what she needs to do, **but this is going to take some time** because it's been so ingrained in her." *Id.* at 13 (emphasis added).

Ms. Oswalt testified to facilitating the "Circle of Security Parenting" with Mother, which she described as a program that focuses "on the nature of attachment relationships between parents and children and how to support healthy relationships and social and emotional development." *Id.* at 57. Ms. Oswalt testified that Mother completed the program in January 2020, but Ms. Oswalt continues to work with Mother on the same issues. *Id.* She stated that although Mother has made progress "in terms of her willingness to own up to some things and to look at and reflect on her past and how that is influencing her," Mother "continues to struggle" and has "ongoing work that she needs to do" with respect to forming a healthy relationship with Child. *Id.* at 60-61; 72-73. Ms. Oswalt testified that the trauma therapist, who Mother

was scheduled to see for the first time on the afternoon of the October 8, 2020 hearing, will help Mother in this regard.  *Id.* at 61.

Consistent with the foregoing, the evidence demonstrated that despite complying with the permanency plan and treatment recommendations, Mother has not yet rectified the issues that caused Child's placement or sufficiently progressed toward reunification with Child.

Next, Mother argues the trial court abused its discretion in failing to order regular visitation with Child.  Mother asserts, "parental visitation is not denied except where a grave threat to the child can be shown."  Mother's Brief at 16.

In *In Re C.J.*, 729 A.2d 89 (Pa. Super. 1999), this Court explained that in dependency cases, the standard against which visitation is measured depends upon the goal mandated in the family service plan.  Where, as in this case, the permanency goal is no longer reunification, the juvenile court may suspend, limit, or deny visitation if it is in the best interests of the child.  *Id*. at 95 ("The 'best interests' standard, in this context, is less protective of parents' visitation rights than the 'grave threat' standard.").  However, where reunification remains the goal of the family service plan, visitation may not be denied or reduced unless it poses a grave threat.[2]  *Id*.  Because the trial court

_____

[2] With respect to the grave threat standard, we have stated:

did not abuse its discretion in changing Child's permanency goal to adoption, this claim has no merit.

To the extent Mother asserts the trial court erred in failing to order regular visitation during Child's dependency, she did not appeal from any of the prior permanency review orders. *See In re C.B.*, 861 A.2d 287, 294 (Pa. Super. 2004) (order suspending the father's visitation was final, appealable order); *In re H.S.W.C.-B*, 836 A.2d 908 (Pa. 2003). Thus, this claim is waived.

With respect to whether the court abused its discretion in concluding visitation with Mother was not in Child's best interests, we reference the testimony of Child's trauma-focused, cognitive behavioral therapist, Ms. Hicks, who opined that "pushing any type of [interaction with Mother] would have

---

It has long been the law in this Commonwealth that "only when the evidence clearly shows that [parents] are unfit to associate with [their] children should [they] be denied the right to see them." *Commonwealth ex rel. Turner v. Strange*, 179 Pa. Super. 83, 86, 115 A.2d 885, 886 (1955). *See also In re Damon B.*, [314 Pa. Super. 391, 460 A.2d 1196 (Pa. Super. 1983)]; *In Interest of Rhine*, 310 Pa. Super. 275, 283, 456 A.2d 608, 613 (1983) ("Visitation has been limited or denied only where the parent has been shown to suffer from severe mental or moral deficiencies that constitute a grave threat to the child."); *In re Mary Kathryn T.*, 427 Pa. Super. 515, 629 A.2d 988 (1993); *In re Adoption of Michael J.C.*, 326 Pa. Super. 143, 473 A.2d 1021 (1984).

*In re C.J.*, 729 A.2d at 95 (citation omitted).

resulted in a negative backslide therapeutically for [Child], just hearing how she has been processing through past abuse and also seeing progress that has been made in [D.N.]'s home." N.T., 10/8/20, at 23. She testified, "I believe it would be beneficial [for Child] to repair that relationship [with Mother], but I don't agree with it being beneficial for the reunification to happen at this time." *Id.* at 38. Ms. Hendricks explained that repairing Child's relationship with Mother "was something that we were going to address and look more closely at once Mother ended up involved with her own [trauma] therapist. . . ." *Id.* at 38. Thus, the record supports the court's decision pertaining to visitation.

Ms. Hendricks testified that in addition to working with Child on trauma-focused cognitive behavioral therapy, she worked with her on enhancing a safety and a support system. *Id.* at 24-25. She stated, "I would say [Child] is extremely insightful. Her growth has been significant since day one when she walked through our doors and I had met her." *Id.* at 23. Ms. Hendricks testified that Child has consistently stated to her that she wants to remain in [D.N.]'s care. *Id.* at 31. She explained Child "feels safe there. She feels secure there. There's . . . a lot of stability. . . ." *Id.* at 32-33. Ms. Hendricks also stated, "It's clear that [Child's] needs are being met, not just her physical needs, but her emotional and social, moral, spiritual needs." *Id.* at 32. Importantly, she testified on redirect examination:

- 11 -

Q. If [Child] would not secure permanency at some point in the near future, what impact would that have on her therapeutic progress?

A. I believe it would be definitely detrimental to her. I feel like she is in a stable environment. She feels safe and secure. Even with . . . school, her performance, her academic achievement, all those things are increasing. She is doing well. She is interacting with peer groups. . . . It has been awesome to see her flourish in the environment she is in with [D.N.]. So I think not having the ability to have that permanency and know that she is safe and secure and being able to continue in that stable environment would definitely affect her in a negative manner.

*Id.* at 52-53.

Child was 14 at the time of the hearing, and had been living with D.N., her adult sister, and brother-in-law for two years. She testified, "Once I started staying here I realized that at home it wasn't like stable, and here I know I want to stay." N.T., 11/19/20, at 15. Child described Mother's abusive behavior toward her and stated it "went on for years." *Id.* at 27. She testified Mother "would call me rude names like retard and just start screaming at me. Like if I did some little thing wrong, I would feel that I would just get screamed at." *Id.* at 17. Child testified, "I really didn't have a lot of friends, and I was kinda really like shy. I feel like if I just made one little mistake, I would get in trouble for it. And so I lied a lot[.] I know that it was because I was afraid of getting screamed at or hit." *Id.* at 17-18. She described one physical altercation with Mother as follows:

Right before I left, there was an incident with a Christmas tree, and she knocked the Christmas tree down, and it fell onto me. My room was a mess and so she came in and pushed me against the wall, and my head hit off the wall. That was like before I left. I

- 12 -

feel like it made me live . . . a life of fear. Like, I was real uneasy
when someone would . . . move towards me too quickly, and . . .
I was just really scared.

*Id.* at 18.

Child testified that more recently, she has "a lot more friends, and I'm more sociable now because I realized that not everyone is like that." *Id.* at 20. She also stated her ". . . grades have improved a lot. I was in Honors eighth grade year." *Id.* at 21. On the other hand, Child testified that when she lived with Mother, she missed "a lot of school." *Id.*

Child also expressed her desire for permanency, stating "just having a definite answer that I know that I'm going to be here would be pretty good." *Id.* at 25. Moreover, Child testified that she understands the difference between adoption and permanent legal custodianship, and she wants to be adopted by D.N. She explained, "I know that adoption will be better because then I know . . . that I will be here forever." *Id.* at 35. Child also testified that she desires ultimately for Mother's parental rights be terminated. *Id.* at 26. With respect to her desire to be adopted by D.N., Child explained:

I know there's going to be food on the table. I'm just worried
about a better future for myself, because I want to go to college
and be a physical therapist assistant. And I have goals for myself.
I am afraid if I go back to that environment, I am not going to be
doing as good in school and social[-]life wise.

*Id.* at 22. When she lived with Mother, Child testified, "I didn't have a lot of motivation. . . ." *Id.*

In addition to demonstrating Child's unequivocal desire for permanency, our review reveals that Mother, while taking actions to satisfy her permanency objectives, has not made enough progress for reunification to occur. Thus, the trial court did not abuse its discretion in ordering that Child's permanency goal be changed to adoption.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/6/2021