J-A10018-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.C., A MINOR | : | |
| | : | |
| | : | No. 3418 EDA 2017 |

Appeal from the Order Entered September 27, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): 51-FN-470660-2009,
CP-51-DP-0113327-2009

| | | |
|---|---|---|
| IN THE INTEREST OF: D.J.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.J.M., A MINOR | : | |
| | : | |
| | : | No. 3424 EDA 2017 |

Appeal from the Order Entered September 27, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): 51-FN-470660-2009,
CP-51-DP-0001315-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.M., A MINOR | : | |
| | : | No. 3428 EDA 2017 |

Appeal from the Order Entered September 27, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): 51-FN-470660-2009,
CP-51-DP-0001316-2015

BEFORE:   GANTMAN, P.J., McLAUGHLIN, J., and RANSOM*, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED JUNE 08, 2018**

---

\*   Retired Senior Judge assigned to the Superior Court.

D.C., D.J.M., and D.M. ("Children") appeal from the order removing them from the home of D.E.C. ("Mother"). We conclude that the trial court violated Children's Due Process rights under the Fourteenth Amendment and that the trial court failed to make the appropriate findings prior to removing Children from Mother's care, apply the proper "clear necessity" standard, and make individualized determinations for each child. We reverse.

In May 2015, the trial court ordered Children committed to the Department of Human Services ("DHS"). Children resided with their maternal grandmother from May 16, 2015 to May 27, 2015. Children returned to Mother on May 27, 2015, and continuously resided with Mother until the August 17, 2017 permanency review hearing. The trial court adjudicated Children dependent on July 1, 2015.

At a June 27, 2017 permanency review hearing before a juvenile court hearing officer, DHS requested that the permanency review hearing be heard by a judge. The hearing officer continued the hearing.

The permanency review hearing reconvened on August 17, 2017, before a trial judge. The case had been listed for 11:30 A.M., but the hearing did not commence until 5:37 P.M.[1] This was the first time since July 1, 2015, that the case was before a judge, rather than a hearing officer, and the first time the case came before the presiding trial judge.

---

[1] The hearing concluded at 6:12 P.M.

DHS called as a witness Kelli Seibert, case manager at Turning Points for Children, a Community Umbrella Agency ("CUA"). Seibert testified that Mother tested positive for cannabis on two occasions, on April 27, 2017, and in May 2017. N.T., 8/17/17, at 8. Her most recent drug screen on June 21, 2017, was negative for all substances. *Id.* Because the June permanency review hearing had been continued, the hearing officer did not order drug screens and, therefore, Mother did not take a drug test between the June and August hearings. *Id.* at 6-7.

Ms. Siebert stated that Mother enrolled in an outpatient treatment program at Chances on June 16, 2017, but did not attend after enrolling. *Id.* at 10. Mother was last engaged in dual diagnosis therapy in March 2017, through NHS Human Services ("NHS"). *Id.* at 9-10.[2] Siebert further testified that Mother attended monthly individual therapy at the Hispanic Community Center, and that Seibert did not ask Mother to attend this therapy more frequently. *Id.* at 10.

Seibert testified that during the 2016 to 2017 school year D.C. had six unexcused absences, 13 excused absences, and three late arrivals. *Id.* Seibert testified that D.C. had Attention Deficit Hyperactivity Disorder. *Id.* at 11. He had not been in therapy "since school has been out," *id.* at 12-13, because Mother was unhappy with the therapist and therapeutic services at the

---

[2] Later in the hearing, counsel for DHS stated that Mother attended three therapy sessions at NHS in March and then stated she could no longer attend because she did not have childcare. N.T., 8/17/18, at 22. At the time, the CUA was paying for daycare for Children. *Id.*

Hispanic Community Center, *id.* at 11. Seibert stated that D.C.'s medical and dental appointments were up to date and he had an Individualized Education Plan ("IEP"). *Id.* at 12.

During Seibert's testimony, the trial court stated:

> So this case hasn't been before a judge since the adjudicatory. I'm looking at this; it's nothing but Master's reviews. **I'm surprised these children are still home. Because if you can't turn around a supervision case within two years, the kids don't need to be in the home.**
>
> So I hope the report [is] better for – as to the other children and maybe [D.C.] is just an aberration because then we need to discuss a concurrent plan because maybe these children need to be placed because we're not having another year of truancy. Because when this case came in, one of these kids w[as] like 72 days unexcused absence, so I mean that's a problem.

*Id.* at 13-14 (emphasis added).

Seibert further testified that Mother had rent arrears, but that she was not at risk of eviction and planned to move to a new home. *Id.* at 14. Further, on August 4, 2017, Mother began part-time employment. *Id.*

In response to a question from DHS suggesting D.C. needed a lead assessment, Seibert clarified that D.M., not D.C., needed an updated lead assessment. *Id.* at 14-15. Seibert gave no additional testimony as to D.M. and did not testify as to D.J.M.[3]

---

[3] At the start of the hearing, counsel for DHS stated: "We'll begin with D.C.," N.T., 8/17/17, at 6, and, before offering Seibert for cross-examination, DHS only asked for a recommendation as to D.C., *id.* at 16.

When asked what the CUA was recommending regarding D.C., Siebert stated: "That he continue to go to therapy and not miss school and also be enrolled in a school once Mom moves closer to the neighborhood." ***Id.*** at 16. When asked what service, support, or steps Mother should take differently for the next 90-day cycle, if the CUA was "asking the Court to consider continued supervision[,]" Siebert responded that she "would be asking [Mother] to do the same things." ***Id.***

The Child Advocate then attempted to cross-examine Siebert:

> [CHILD ADVOCATE]: You haven't been on this case very long, have you Ms. Seibert?
>
> [THE WITNESS]: No.
>
> THE COURT: Relevance.
>
> . . .
>
> What's the relevance, she's case manager. She's given charge to review the entire case record. She's supposed to know the history. So I want [sic] to know whether she got on yesterday or she's been on three years. I expect her to know this case. What's the relevance of your question.
>
> [CHILD ADVOCATE]: The follow up question is whether she reviewed the file, but –
>
> THE COURT: She's a case manager. I assume that she's reviewed the file, knows the history of this case.
>
> Do you know the history Ms. Seibert?
>
> THE WITNESS: Yes.
>
> THE COURT: All right.
>
> [CHILD ADVOCATE]: Mother had a period where she had several months of clean screens about a year ago, correct?
>
> THE COURT: Relevance.

What have you done for me lately?

Because what I'm hearing is she's tested positive since the last court date. I don't care what happened a year ago.

[CHILD ADVOCATE]: And her most recent screen was clean, correct?

[THE WITNESS]: Yes.

THE COURT: And two were positive.

Okay. That doesn't – that doesn't denote sobriety.

[CHILD ADVOCATE]: You've seen the levels for those screens and the fact is those levels have been going down overtime, correct?

THE COURT: Did she actively engage in drug and alcohol as she's been court ordered to do? Is she doing dual diagnosis as she's been court order to do? Are these children truant as she been court ordered to do? **We've been sitting here for two years doing the same thing with the same results. So what are you going to do different because supervision isn't working out on this case.**

THE WITNESS: Yes, Your Honor.

THE COURT: **And tell me why at 5:50 I'm not placing three kids at the Bar of the Court right now.** I can put a commit on them and with police assistance you guys go out and get these kids because that's where I'm feeling we should go right now. **It's never been before a judge, so here we are and I'm listening to this and why would I give Mom a chance when she's had two years to turn this around with [C]hildren in her home. They should have been removed a long time ago.**

*Id.* at 17-19 (emphasis added).

The Child Advocate then attempted to explain to the trial court that Seibert was the third CUA case worker assigned to the case in the previous six months, that there previously was an issue with an order that required conflicting services for Mother, and that D.C. had six unexcused absences this

year, compared with 71 unexcused absences during the school year when Children were found dependent. *Id.* at 19-20. The Child Advocate stated that D.C. obtained a 504 Plan,[4] not an IEP, in January, and has improved "tremendously since getting the supports" he is entitled. *Id.* at 21.

The Child Advocate further explained that Mother ensured D.J.M. received speech therapy, was attempting to transfer D.J.M. to an emotional support classroom, and had D.M. enrolled in a preschool. *Id.* She further stated Mother was bringing Children to back-to-school night the following evening. *Id.*

After a discussion about the last time Mother used marijuana, the trial court stated:

> So she asked a follow up question: When's Mom's birthday? She's not trying to pick the case apart. Let me tell you something, [Child Advocate]. You know what? You need to kind of just step back from this case and don't get all emotional about it because **for me it's very black and white, either Mom is compliant or she's not.** You can't say she's compliant right now because while you give justifications for her not doing what she's supposed to do, they have a progress report saying, "Hey, You know what? Mom reported that she was in enrollment at Chances," but we followed up and they said, "Hey, She's not a member," so there's a credibility issue right there.
>
> And I'm talking about kids that are nine and the other child is what, five, and then the other child is four and they're vulnerable in terms of their age, so I have to look at this. And guess what? Weed is still illegal in the Commonwealth of Pennsylvania.

---

[4] Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

Have a problem with it. **If Mom is supposed to do dual diagnosis and it's been two years, it's well within the Court's right to remove the children because, you know what, we need to go into [a] different direction because this ain't working. I'm not giving it another 90 days for Mom to try to get it together. She hasn't.** When the – when [D.C.] was like in first grade he missed 72 days. Mom's getting better because he only missed six, but Mom's still smoking weed and he's not going to his therapy for whatever reason because the onus shouldn't be on a nine year old to get himself to therapy.[5] Mom's supposed to do that. Mom's not doing that; that's a problem.

And as Child – as Child Advocate, I would think that you would want to vote for your client to make sure that he gets the therapy he needs. What justification do we have that this child is not in therapy.

*Id.* at 25-26 (emphasis added).

The child advocate then asked her next two questions of Seibert:

[CHILD ADVOCATE]: Is In-home Safety Services the level of CUA that's put in at the moment?

[THE WITNESS]: No.

[CHILD ADVOCATE]: That's the highest level of in-home services and that's not where we're at.

*Id.* at 26-27.

The court then stated:

Well, I'm telling you where I'm at behind the preposition. **Where I'm at at 5:58 is that these kids should not remain in the home.** That is where I am, and that these children should have a start at a great school year. The five

_____

[5] DHS asked Seibert whether D.C. stopped attending therapy at DHS because Mother "expect[ed] him to walk himself to the therapy provider." N.T., 8/17/17, at 11. Seibert stated that "Mom said she wasn't happy with the therapist and the therapeutic services there. I asked D.C. why he wasn't going to therapy and he said he didn't feel like walking. He didn't necessarily imply that he had to walk there by himself." *Id.*

> year old needs to be in kindergarten or head start, whichever's appropriate. The nine year old needs to – now if you want to talk to Mom about some viable options in terms of placement, family members or something like that, I'll do that, **but at 27 months, you can't still talk about supervision and what Mom is not doing. I'm not having it. That doesn't fly for me.**

*Id.* at 27 (emphasis added).

The court, counsel for DHS, counsel for Mother, and the Child Advocate then discussed Mother's rent arrears, mental health treatment, and her new job, which required drug testing. *Id.* at 28-29. During a discussion about whether Mother had to take prescribed medications,[6] the trial court stated:

> So you're saying, well, you know she doesn't have to take medication. And she doesn't have to do mental health. She doesn't. She doesn't even have to do D&A. I agree with you; she doesn't. The Court can may – just – **the Court is going to exert its choice that these children need to be removed from the home of Mom because Mom's not compliant.**
>
> As long as there's a court order, Mom needs to do whatever the court order is. And if you're telling her, it's a choice, then, that's a problem. A court order – anything short of compliance is violation of a court order.

*Id.* at 29 (emphasis added).

Mother then spoke to the court. She noted that "a lot of this stuff that's going around is not true." *Id.* at 32-33. She claimed that she was in rent arrears because Turning Points had said it would pay her rent, but had not done so. *Id.* at 33-34. She stated she had had 13 clean drug tests, but was

---

[6] No one stated Mother was not taking the prescribed medicine. Counsel for DHS noted that medication management was outstanding, and the Child Advocate stated that "medication's a choice." N.T., 8/17/17, at 28.

still under DHS supervision because her daughter needed lead testing, which she has since had. *Id.* at 34. Mother admitted that she relapsed and smoked marijuana on her birthday, which was August 31.[7] *Id.* at 34, 36. She stated that D.C. had been attending therapy during school hours, and that NHS lost his chart. *Id.* at 35.

The trial court then concluded:

> **I just think that at this point in time that the children have to come out [of] the home forthwith. I do not believe that Mom – Mom is not compliant at this listing in terms of her objectives. As far as I'm concerned, it's been 27 months and at some point in time, supervision, I believe, is sufficient [sic] to remedy the issues that are before the Court.**
>
> The dependency issues are Mom is, for whatever reason, still testing positive for marijuana. The last three screens, two were positive. Secondly, the children are supposed to be in therapy, at least the nine year old. I'm not hearing that that happened. I can't confirm that Mom is actively engaged in a dual diagnosis program. I want no truancy as to the nine year old. Make sure that the baby has the speech therapy.
>
> We can explore family members for possible placement resources. Single Case Plan Meeting to be held within 20 days.
>
> I don't know how you want to do this. You can get an [Order for Protective Custody].

*Id.* at 39-40 (emphasis added). Children and Mother objected.

Children filed a Motion for Reconsideration, which the trial court expressly granted. On September 27, 2017, the trial court held a hearing,

---

[7] DHS noted that the positive drug screens in April and May were not close in time to August 31.

after which it denied the relief sought in the Motion. Children filed a timely notice of appeal.[8] On December 12, 2017, while this appeal was pending, Children returned to Mother.

In its opinion filed pursuant to Pennsylvania Rule of Appellate Procedure 1925(a),[9] the trial court noted that Mother had tested positive for drugs in April and May, was not enrolled in therapy, and was in arrears on her rent. Trial Court Opinion, filed Dec. 19, 2017, at 1 ("TCO"). Further, it noted that D.C. was not attending therapy and that truancy "remained an issue," as D.C. had six unexcused absences, 13 excused absences, and was late three times for the most recent school year. *Id.* at 3. It claimed that D.C.'s "siblings were not enrolled in school as per Mother's objectives." *Id.*[10] The court further stated that although the CUA was paying for Children's daycare, Mother informed the CUA that she did not attend mental health sessions due to lack

---

[8] Each Child filed a separate notice of appeal. On October 31, 2017, this Court consolidated the cases *sua sponte*.

[9] The trial court issued separate Rule 1925(a) opinions for each appeal. The only changes appear to be substituting the initials of the appropriate child.

[10] The trial court cites page 21 of the notes of testimony for this proposition. On page 21, the Child Advocate stated that D.C. was the only compulsory school-aged child, that D.J.M. received speech therapy, that Mother was working on transferring D.J.M. to an emotional support classroom, that D.M. was enrolled in preschool, and that Mother would enroll Children in school after she moved on August 31 and planned to attend Back to School night with them on August 18.

of child care, *id.* at 3, and noted that Mother stated she had enrolled in a drug treatment program, but had no records of enrollment. *Id.* at 4.

The trial court then stated that Mother had "a history of credibility issues and the services offered did not stabilize Mother's home," and that Mother "failed to properly parent the children." *Id.*[11]

The trial court concluded that the dependency issues "had not been remedied with supervision over the twenty seven months" and Children "needed to be removed from the home of Mother due to inconsistency of drug screens, concerns for sobriety, lack of compliance with objectives and violations of court orders." *Id.* It stated that the court "ordered the placement of [Children] . . . to avoid any further truancy issues for D.C.'s sibling and to ensure D.J.M. was receiving speech therapy." *Id.*[12]

The court stated it was not responsible "for the administrative listing of the matter nor the availability of the counsel of record at the call of case." *Id.* It stated the clerk of court called the case when appropriate and it referenced the late hour due to "the necessity to remove [Children] from the home in a timely fashion without incident." *Id.* It further claimed it "inquired about the

_____

[11] The trial court further claimed that Mother "failed to ensure children were receiving consistent therapy." TCO, at 4. The only testimony regarding failure to receive therapy related to D.C., and the Child Advocate stated that D.J.M. received speech therapy.

[12] There was no evidence that D.C.'s siblings, D.J.M. and D.M., were not attending school and no evidence that D.J.M. was not receiving speech therapy.

posture of the case," and "allowed all counsel full and fair opportunity to present witnesses, documentation and testimony." *Id.*

The trial court concluded that "its ruling was in the best interest of [Children], based on the testimony regarding [Children's] safety, protection, mental, physical, and moral welfare." *Id.*

Children raise the following issues on appeal:

> 1. Did the trial court err as a matter of law and abuse its discretion when it ordered the removal of D.C., D.J.M., and D.M. (collectively, the "Children") from the care of D.E.C. (hereinafter referred to as "Mother"), absent any evidence demonstrating clear necessity to do so, when there was testimony Mother was compliant with her case objectives, as she had appropriate housing, was currently employed, and Mother's most recent, June 23, 2017, drug and alcohol screen was negative for all substances?
>
> 2. Did the trial court err as a matter of law and abuse its discretion when it ordered the removal of the Children from the care of Mother, absent any evidence demonstrating an imminent risk of harm to, or any safety concerns as to, the Children, when there was testimony Mother had appropriate housing, Mother acquired school-based disability accommodations for D.C., under Section 504 of the Rehabilitation Act of 1973, Mother's most recent, June 23, 2017, drug and alcohol screen was negative for all substances, and the court did not allow nor itself conduct any inquiry into the safety of the Children in Mother's care?
>
> 3. Did the trial court err as a matter of law and abuse its discretion when it conflated the matters of D.J.M. and D.M. with their sibling, D.C., by using a history of unexcused absences by D.C. as a basis for D.J.M. and D.M.'s removal from the care and custody of Mother, when D.J.M. and D.M. have not previously been school-aged and therefore school attendance and truancy are not at issue, and there was no testimony the history of truancy of sibling D.C. impacted upon the health, safety or welfare of D.J.M. or D.M.?

4. Did the trial court err as a matter of law and abuse its discretion in denying the Children's due process rights when it prevented the Children's counsel from fully questioning witnesses and putting on a case under circumstances where the trial court called the case approximately six hours past the time the case was listed to be called, and during the hearing repeatedly cited the late hour of the day purportedly as justification for the court's curtailing of testimony by preventing the Children's counsel from conducting cross examination, and conducted itself in a manner that prevented the Children's counsel from a fair and full opportunity to represent the Children?

Children's Br. at 13-14 (suggested answers omitted). Community Legal Services filed an *amicus curiae* brief in support of Children's appeal. DHS did not file a brief in support of the trial court's order.

We review a trial court's determination in dependency matters for an abuse of discretion. *In re R.W.J.*, 826 A.2d 10, 12 (Pa.Super. 2003). "[W]e must accept the facts as found by the trial court unless they are not supported by the record." *Id.* (quoting *In re C.J.*, 729 A.2d 89, 92 (Pa.Super. 1999)). "[W]e are not bound by the trial court's inferences, deductions, and conclusions." *Id.* Further, we must "ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record." *Id.* (quoting *Matter of George,* 414 A.2d 1063 (Pa.Super. 1979)).

## I.    Whether the Case is Moot

As Children have been reunited with Mother, we must first determine whether this appeal is moot. We conclude that it is not. In *In re D.A.*, a mother appealed an order finding a child dependent and, while the appeal was

pending, the dependency case was closed such that the child was no longer a dependent child. 801 A.2d 614, 616-17 (Pa.Super. 2002). We concluded that the case qualified for an exception to the mootness doctrine—that "a party to the controversy will suffer some detriment due to the decision of the trial court." *Id.* at 616. We reasoned that the finding of dependency "could detrimentally affect any future proceedings in which [Children, Youth and Family Services] would be involved with this family." *Id.* at 617. Similarly, here, a finding that Children should be removed could detrimentally affect future proceedings for the family. We, therefore, conclude that the case is not moot and will address the merits of Children's claims.

## II. Whether the Trial Court Violated Children's Due Process Rights

We will first address Children's last issue—whether the trial court violated their Due Process rights. Children argue the trial court violated their Due Process rights by preventing counsel from questioning witnesses and presenting their case, and by referencing the late hour as justification for curtailing testimony. We agree.

One of the stated purposes of the Juvenile Act is "[t]o provide means through which the provisions of this chapter are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights recognized and enforced." 42 Pa.C.S.A. § 6301(b)(4).

"Due process requires that the litigants receive notice of the issues before the court and an opportunity to present their case in relation to those

issues." ***Brooks-Gall v. Gall***, 840 A.2d 993, 997 (Pa.Super. 2003) (quoting ***In re M.B.***, 514 A.2d 599, 601 (Pa.Super. 1986)). "At its core, procedural due process requires, 'adequate notice, opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case.'" ***S. Med. Supply Co. v. Myers***, 804 A.2d 1252, 1259 (Pa.Super. 2002) (quoting ***Krupinski v. Vocational Tech. Sch.,*** 674 A.2d 683, 685 (Pa. 1996)). "The right of a litigant to in-court presentation of evidence is essential to due process; in almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." ***M.O. v. F.W.,*** 42 A.3d 1068, 1072 (Pa.Super.2012).

Here, the trial court violated Children's Due Process rights. The trial court repeatedly interrupted the Child Advocate during her cross-examination of DHS's sole witness and never provided an opportunity for Children to complete the cross-examination or to present their evidence. Although Mother spoke at the hearing, she was not questioned by counsel. In addition, the trial court often interrupted both Mother and the Child Advocate when they were attempting to provide the court with information.[13] Further, the trial court frequently referenced the late hour, and, from the start of the hearing, concluded that removal would be necessary because the case had been open

---

[13] We caution the trial court to allow all parties an opportunity to present witnesses and evidence. Statements from counsel should not be used as evidence; rather, trial courts must permit counsel an opportunity to present evidence through questioning witnesses and admitting exhibits.

for 27 months. The trial court's actions during this hearing denied Children the "opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal.'" ***See Southern Med. Supply Co.***, 804 A.2d at 1259.

### III. Whether the Trial Court Made Proper Findings and Applied Proper Standards

We will next address Children's first three issues. Children maintain the trial court failed to make the necessary findings and applied the wrong standard when removing Children from Mother's care. Children argue that the safety of a child in a home "does not correlate to the length of their docket, but rather is a determination the court makes after hearing evidence from all on the totality of the circumstances." Children's Br. at 21. They argue DHS did not present evidence to establish that removal was clearly necessary and that the trial court applied the best-interest of the child standard, rather than the clear necessity standard that should be applied prior to removing a child. Children further argue that the trial court erred in removing D.J.M. and D.M., where little to no evidence was presented regarding them.

The purposes of the Juvenile Act include, among other things, "[t]o preserve the unity of the family whenever possible," 42 Pa.C.S.A. § 6301(b)(1), and to achieve the Act's purposes "in a family environment whenever possible, separating the child from parents only when necessary for his welfare, safety or health or in the interests of public safety." ***Id.*** at § 6301(b)(3).

- 17 -

If a trial court finds a child dependent, it may make an order of disposition "best suited to the safety, protection, and physical, mental, and moral welfare of the child." *Id.* at § 6351(a). The disposition may include, but is not limited to, permitting the child to remain with his or her parents, "[s]ubject to conditions and limitations as the court prescribes" or transferring temporary legal custody to "[a]ny individual resident . . . . including any relative, who . . . is found by the court to be qualified to receive and care for the child." *Id.* at § 6351(a)(2).

**A. Findings Required Prior To Removal**

The Juvenile Act requires that the trial court make certain findings prior to removing a child from his or her parents:

> **(b) Required preplacement findings.--**Prior to entering any order of disposition under subsection (a) that would remove a dependent child from his home, the court shall enter findings on the record or in the order of court as follows:
>
> > (1) that continuation of the child in his home would be contrary to the welfare, safety or health of the child; and
> >
> > (2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition; or . . . .

42 Pa.C.S.A. § 6351(b).

Here, the trial court abused its discretion when it ordered Children removed from the home without making the proper findings. The trial court based its decision to remove Children on the length of the case and Mother's

- 18 -

failure to comply with her objectives. The trial court noted Mother's positive drug tests and non-compliance with some objectives and D.C.'s six unexcused school absences and non-attendance at therapy. However, it made no finding that remaining in the home would be contrary to Children's welfare, safety, or health, such that removal was required. The trial court also failed to make any finding that the higher level of in-home services, which had not yet been implemented, would not have enabled Children to remain in the home or was not feasible.

**B. Whether the Trial Court Applied the Clear Necessity Standard**

This Court has noted "that a child should be removed from [his/]her parent's custody and placed in the custody of a state agency only upon a showing that removal is clearly necessary for the child's well-being." ***A.N. v. A.N.***, 39 A.3d 326, 331 (Pa.Super. 2012) (quoting ***In Interest of K.B.***, 419 A.2d 508, 515 (Pa.Super. 1980)) (alteration in original). We have explained "that clear necessity for removal is not shown until the hearing court determines that alternative services that would enable the child to remain with [his/]her family are unfeasible." ***Id.***

The trial court abused its discretion when it failed to apply the "clear necessity" standard. The trial court found that removal was in Children's best interest, without mention of "clear necessity." TCO, at 4.[14] Further, as noted

_____

[14] It further appears that the evidence would not have supported such a finding. Although there was evidence Mother could improve compliance with

- 19 -

above, the trial court made no finding that the alternative services available would not enable Children to remain with Mother, as would be required when applying the clear necessity standard. ***A.N.***, 39 A.3d at 331.

### C. Whether the Trial Court Made Individualized Findings for Each Child

Trial courts must make individualized findings regarding removal for each child, and cannot find removal necessary merely based on a finding that removal of a sibling is necessary. ***See In the Int. of Theresa E.***, 429 A.2d 1150, 1156 (Pa.Super. 1981) (reversing adjudication and removal where evidence concerned only alleged dependency of siblings).

Here, the trial court abused its discretion in basing the need for removal of D.J.M. and D.M. on the facts entered regarding D.C. The trial court had very little information before it regarding D.J.M. and D.M. Indeed, Seibert did not discuss D.J.M. and her sole statement regarding D.M. stated that D.M. needed a lead assessment. In addition, Seibert only made a recommendation as to

---

her objectives, and that Mother needed to ensure D.C. attended school and therapy, there was no evidence regarding any detrimental impact on Children that would require removal. Indeed, when making a recommendation as to D.C., the only child for whom she made a recommendation, Seibert did not recommend removal. Rather, she recommended that D.C. "continue to go to therapy and not miss school and **also be enrolled in school once Mom moves closer to the neighborhood**." N.T., 8/17/17, at 16 (emphasis added).

D.C. Any information as to D.J.M. and D.M. came from counsel or Mother, and was limited in nature.[15]

   Order reversed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/8/18

---

[15] Further, the limited information that the trial court heard included that D.J.M received speech therapy, that D.M. was enrolled in preschool, and that Mother was attempting to ensure D.J.M. was placed in an emotional support classroom. We fail to see how such testimony, even coupled with Mother's positive drug tests in April and May and her failure to attend dual diagnosis treatment, could establish clear necessity for removal.