J-S22016-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.F., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: N.S., MOTHER | : | No. 606 EDA 2022 |

Appeal from the Order Entered January 25, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001045-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.G., JR., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.S., MOTHER | : | No. 607 EDA 2022 |

Appeal from the Order Entered January 25, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001046-2020

BEFORE:    BOWES, J., McCAFFERY, J., and SULLIVAN, J.

MEMORANDUM BY McCAFFERY, J.:                    **FILED AUGUST 30, 2022**

N.S. (Mother) appeals[1] from the permanency review orders entered January 25, 2022, in the Philadelphia Court of Common Pleas, suspending visitation with her daughter, E.F., born in October 2012, and son, Z.G., Jr. (Z.G.), born in June 2020 (collectively, the Children), pending further order of court.  While the Philadelphia Department of Human Services (DHS) has filed motions for goal changes and for termination of Mother's parental rights, at

_____

[1] Mother's two appeals were consolidated by this Court on May 18, 2022.

this time the goal remains reunification. Mother avers the trial court erred by: (1) failing to make reasonable efforts to maintain the parent-child relationship; (2) considering her criminal case, in which she is accused of abusing the Children's sibling; and (3) determining that termination of visitation was in the Children's best interest. We affirm.

## I. Appealability of Orders

Preliminarily, we *sua sponte* review whether we have jurisdiction to review the instant appeal. In particular, we must determine whether the orders in question are appealable orders. ***See Interest of L.B.***, 229 A.3d 971, 975 (Pa. Super. 2020). "'An appeal lies only from a final order, unless permitted by rule or statute.' Generally, a final order is one that disposes of all claims and all parties. ***See*** Pa.R.A.P. 341(b)." ***Id.***

In ***Interest of L.B.***, the juvenile court issued a permanency review order, which suspended the father's visitation pending a recommendation by the child's therapist, and set a date for a subsequent permanency review hearing. ***Id.*** at 974-75. On appeal, this Court concluded the order was not a final order, as it did not dispose of all claims and parties.[2] ***Id.*** at 975.

---

[2] Meanwhile, "[a]n order granting or denying a goal change request, in a case involving a dependent child, is an appealable order." ***Interest of: L.B.***, 229 A.3d at 975 n.4 (citation omitted).

However, the *Interest of L.B.* Court determined the order was appealable under the collateral order doctrine. *Interest of L.B.*, 229 A.3d at 976-77.

> The "collateral order doctrine" exists as an exception to the finality rule and permits immediate appeal as of right from an otherwise interlocutory order where an appellant demonstrates that the order appealed from meets the following elements: (1) it is separable from and collateral to the main cause of action; (2) the right involved is too important to be denied review; and (3) the question presented is such that if review is postponed until final judgment in the case, the claimed right will be irreparably lost. *See* Pa.R.A.P. 313.
>
> Our Supreme Court has directed that Rule 313 be interpreted narrowly . . . . To invoke the collateral order doctrine, each of the three prongs identified in the rule's definition must be clearly satisfied.

*Id.* at 975 (citations omitted). The Court determined the first prong was satisfied, where the father's challenge — to "the juvenile court's decision to outsource to a therapist the determination of when his visits with [the child] may or may not resume" — was "clearly separable from and collateral to the main cause of action." *Interest of L.B.*, 229 A.3d at 977. The Court further reasoned:

> [B]ecause this order resulted in the complete denial of visitation, it is both a "right . . . too important to be denied review," and "if review is postponed until final judgment in the case, the claimed right will be irreparably lost." [*See*] Pa.R.A.P. 313(b). Accordingly, . . . this order satisfies both the second and third prongs of the collateral order doctrine.

*Id.* at 976.

We conclude the instant order, indefinitely suspending all of Mother's visitation, while the permanency goal remained reunification, is analogous to the order in **Interest of L.B.** Mother's challenge to the suspension of her visitation is separate from and collateral to the main dependency matter; the complete denial of visitation to her is a right too important to be denied review; and her claim will be irreparably lost of review is postponed until final judgment in this matter. **See Interest of L.B.**, 229 A.3d at 976-77. Accordingly, we conclude the orders are appealable pursuant to the collateral order doctrine, and we have jurisdiction to review Mother's appeal. **See** Pa.R.A.P. 313; **Interest of L.B.**, 229 A.3d at 976-77.

## II. Facts & Procedural History

We first summarize the relevant history concerning the Children's sibling, M.T.S., Jr. (Sibling), who is not a subject of the instant dependency matters, but who is significant to the trial court's finding of aggravated circumstances against Mother. On August 28, 2018, DHS received a child protective services (CPS) report alleging Mother physically abused (Sibling), then one year old. At this time, E.F. was approximately five years old, and Z.G. was not born yet.[3] DHS obtained an order of protective custody for Sibling, and he was placed in the care of the maternal grandmother

---

[3] **See** Trial Ct. Op., 4/20/20, at 6-7, 12 (E.F. was seven years old in the fall of 2020).

(Grandmother), with whom E.F. lived. Sibling was adjudicated dependent on September 12th and committed to DHS. Trial Ct. Op. at 2, 6.

Mother gave birth to Z.G. on June 22, 2020. Mother, E.F., and Z.G. moved into a shelter. Trial Ct. Op. at 7-8. DHS visited them and in-home services were implemented. *Id.* at 8. At that time, "Mother had been attending mental health treatment . . . since October 2019. She completed parenting education . . . and a housing program on April 29, 2020." *Id.*

At this juncture, we note Mother was diagnosed with bipolar disorder, attention deficit hyperactivity disorder, and suicidal ideations while incarcerated. Trial Ct. Op. at 3. Mother also told DHS "she suffers from anxiety and depression. [She] has an IQ of 65 and is currently on probation in Montgomery County for charges related to assault, retail theft, and drugs." *Id.* at 11. Furthermore, E.F.'s father and Z.G.'s father "are not involved in the care of their respective children." *Id.* at 12.

On July 20, 2020, the trial court discharged DHS' commitment of Sibling and ordered his return to Mother's care. Trial Ct. Op. at 8. On July 31st, Mother was discharged from the shelter due to her non-compliance with rules. *Id.* She and the Children moved into an apartment. On August 3rd, a Community Umbrella Agency (CUA) visited the family and determined the Children were safe at that time. *Id.*

On September 8, 2020, DHS received a child protective services report, stating Sibling was taken to the emergency room that day by a young adult

male cousin, who stated "all the bruises came from a fall from the jungle gym" the day before.[4] Trial Ct. Op. at 9. "An X-ray revealed [Sibling] sustained a left humeral condylar avulsion fracture," or an injury to the elbow. ***See id.*** Hospital staff determined Sibling "had multiple bruises and abrasions on his arms[,] legs [and upper lip], swelling of his left arm[,] bruises on his eyes and right ear[,] a healing loop mark and healing abrasion on his back, and elevated liver enzymes." ***Id.*** at 9-10. The Child Protection Team found: (1) "the patterned bruising was the result of being hit with a cord or belt;" and (2) "the injuries to his head and the fractured arm would not have resulted from a single fall, as reported[.]" ***Id.*** at 10. Sibling required surgery for his arm. ***Id.*** Mother admitted to DHS that Sibling was in her care at the time of the alleged playground incident, and claimed he was "clumsy and sustains many bruises due to his light complexion." ***Id.*** at 11.

"On September 9, 2020, DHS visited Mother's home after learning that she had not taken Z.G. to the hospital for a skeletal exam, as requested." Trial Ct. Op. at 11. Mother "stated that Z.G. was in the care of his Maternal Aunt . . . and E.F. was in the care of her Paternal Grandmother." ***Id.*** Meanwhile, on September 11th, DHS obtained an order of protective custody for Sibling "and placed him in the care of Maternal Aunt." ***Id.*** at 12. On

---

[4] When DHS visited the hospital the following day, it "was informed that [Sibling's] Father had transported him to the hospital." Trial Ct. Op. at 10.

September 18th, he "was placed in a confidential medical foster home[,] where he currently remains." *Id.*

On October 2, 2020, DHS filed urgent dependent petitions for E.F. and Z.G. On October 26th, Mother was arrested in connection with the abuse of Sibling and charged with aggravated assault, simple assault, endangering the welfare of children, and recklessly endangering another person. She was incarcerated at Riverside Correctional Facility, and released on December 15th with a condition that she have no contact with Sibling. Trial Ct. Op. at 13. It appears this criminal matter was still pending at the time of the January 25, 2022, emergency hearing. *See* N.T. at 35.

On December 29, 2020, Mother removed E.F. and Z.G. from the homes they were residing in. That same day, "upon further assessment by DHS and the Philadelphia Police, [the Children] were found at the home of" S.R., and a safety plan was implemented for them to remain there. Trial Ct. Op. at 13.

On January 6, 2021, at a permanency review hearing for Sibling, the trial court found aggravated circumstances existed,[5] and ordered that no efforts be made to reunify him with Mother. Trial Ct. Op. at 14-15. On the same day, the trial court also found aggravated circumstances with respect to

_____

[5] *See* 42 Pa.C.S. § 6302 (defining "aggravated circumstances" to include circumstance where "[t]he child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent[ ]").

Mother and the Children, adjudicated them dependent, transferred legal custody to DHS, and placed the Children in a confidential foster care location. *Id.* at 15. The court directed that Mother "have line of sight, sound supervised visits at the agency." *Id.*

> Mother was referred for an intensive anger management program, to attend [Behavioral Health Services] for consultation/evaluation, and to be referred for a parental capacity evaluation[ and] the Court's Central Evaluation Unit (CEU) for a forthwith drug screen, dual diagnosis assessment, and three random drug screens, as well as to the Achieving Reunification Center (ARC) for appropriate services.

*Id.*

Mother had visits with the Children through November 2021. N.T. Motion, 1/25/22, at 27. DHS reported that from January of 2021, "Mother has displayed increasingly unmanageable behaviors. [She] has lodged at least [23] complaints and/or grievances concerning the Children's status, various assigned Community Umbrella Agency . . . staff members, and/or various foster caregivers." Trial Ct. Op. at 16. By way of example, on January 14, 2021, Mother was

> visibly upset that CUA manager Ronara Jones had brought the Children to [a supervised] visit and declared she would file a police report against Ms. Jones for harassment and threats, alleging that Ms. Jones had threated to kill her, blow her head off[ ] and never let [her] see the kids again. Mother was able to de-escalate after redirection.

*Id.* at 17 (emphasis omitted). That same month, Mother also threated "to shoot the case management team." *Id.* at 37; N.T. at 16. Over that same period (beginning January of 2021), DHS received at least 14 reports alleging

- 8 -

the mistreatment or neglect of the Children in their various confidential foster placements, all of which were investigated and found to be "invalid." Trial Ct. Op. at 15. After May of 2021, DHS was "unable to verify Mother's mental health treatment." *Id.* at 25.

Between January 2021 and January 2022, E.F., who was then eight or nine years old, was placed in 11 different foster homes. Trial Ct. Op. at 38. Kasey Roscoe, a former CUA case manager in this case, testified:

> The movement to different foster homes occurred because Mother told E.F. she did not have to listen to the foster parents and [to] be defiant. The foster parents [were] unable to deal with [E.F.] and . . . submit[ted] their 30-day notice to end her stay. At supervised visits, Mother . . . question[ed] E.F. about the foster parents and then reports would be filed, and E.F. would have to be moved to another foster home. [N.T. at 29-30.]

*Id.* Although it was recommended for E.F. to be evaluated for mental health treatment, Mother refused to sign consent forms. *Id.* at 16, 17, 42.

On December 16, 2021, DHS filed the underlying motions for an emergency hearing regarding Mother's visitation with E.F. and Z.G. DHS noted the Children's next case listing was February 3rd, but averred: (1) the Children experienced significant displacement disruptions due to Mother's increasingly unmanageable behavior; and (2) DHS and CUA were unable to effectively re-direct Mother's escalating behavior at supervised visits, and thus unable to ensure the Children's emotional and physical safety. DHS requested virtual visitation between Mother and the Children, as well as permission to authorize that E.F. be referred for trauma therapy. On January 19, 2022, DHS

filed petitions for a goal change and for the termination of Mother's parental rights.

The trial court conducted a hearing on January 25, 2022. DHS advised the court it sought to proceed on the motion to modify Mother's visitation only. N.T. at 6, 8. DHS would then proceed on the termination petition at the already-scheduled February 3rd hearing, where it would present the testimony of an expert witness. *Id.* at 7.

Mother was present, testified, and was represented by counsel. DHS presented the testimony of: Crystal Robinson, CUA Assistant Program Director; Ms. Roscoe, former CUA case manager; and Tommy SanMiguel, former CUA case manager supervisor. The Children were represented by a child advocate. We note that at the time of the hearing, E.G. was nine years old and Z.G. was 19 months old.

Crystal Robinson oversaw the Children's case from December 2019 to May of 2021. She testified that implementation of the trial court's orders was "difficult" as a result of Mother's conduct. N.T. at 10-11. She explained:

> [I]t was very difficult for . . . the case managers [and] supervisors to offer redirection for simple things such as what to feed the [C]hildren or not to do certain things, [such as] lifting up clothes and checking them and exposing their body parts in the middle of a visit.[6]

---

[6] Previously, Mother "reportedly exhibited inappropriate behavior during visits [with Sibling] and undressed [him] to check for marks and bruises[. T]he [c]hild appeared uncomfortable at those times." Trial Ct. Op. at 14.

N.T. at 11. Mother became "irate and upset" when the case management team said something "that she doesn't want to hear" or there was a change "that she doesn't like." *Id.* at 23. She screamed and cursed at, and was disrespectful to, the staff who supervised the visits. *Id.* at 21. This behavior occurred so soften that caseworkers did not want to supervise visits. *Id.* at 12. Accordingly, CUA "had a significant amount of case management changes as a result of [Mother's] constant complaints, investigations, grievances, police reports, requests for stay-away orders and threats." *Id.* at 10. One CUA social worker did obtain a stay-away order against Mother. *Id.* at 25. Ms. Robinson recounted Mother's threat in January 2021, immediately following the Children's placement, to shoot the case management team. *Id.* at 15. Ms. Robinson did not believe Mother's supervised visitation should be expanded, as the quality of visits did not improve. *Id.* at 18.

Ms. Roscoe, who managed this case from May of 2021 to January of 2022, testified, by way of further example of Mother's inappropriate behavior, about a supervised visit in October of 2021. Ms. Roscoe informed Mother that visits falling on Thanksgiving and Christmas would be rescheduled "to earlier in the week," and Mother became upset, yelled, and screamed. N.T. at 36. Mother called the "hotline" and reported she "wanted a new case manager" and that Ms. Roscoe did not "want to do [her] job." *Id.* at 37. The Children were present at this time. Mother also made a police report against Ms. Roscoe, alleging Ms. Roscoe was harassing Mother, going to "her job and her

home[ and] waiting for her to come out, calling her asking to meet up," and threatening she knew "people that could end [Mother's] life[.]" *Id.* at 38-39.

Additionally, Ms. Roscoe testified that during visits, Mother encouraged E.F. to make complaints against her foster parents and to defy her foster parents. N.T. at 30, 32. Mother additionally attempted to gain information, including from E.F., about the Children's confidential placements, and she took a picture of a foster parent's car license plate. *Id.* at 31, 34, 46, 52. She further told E.F. to take pictures and videos of Sibling during their sibling visits, despite the stay-away order in her pending criminal matter. *Id.* at 35. Ms. Roscoe opined it was not possible to implement line of sight/line of hearing supervised visitation, either in the community or at the agency. *Id.* at 42.

Ms. Robinson and Ms. Roscoe both testified E.F.'s behavior in the foster homes and school worsened, as E.F. lied, stole, acted out, and acted defiantly. N.T. at 19, 29. Ms. Roscoe stated that "usually," following a visit, the foster parent would report E.F.'s behavior was worse, and E.F. would tell them "her mom said . . . she doesn't have to listen to them," and E.F. ignored the foster parents "when they're redirecting her on things." *Id.* at 47. Ms. Robinson stated this behavior contributed "to the disruptions in the placements." *Id.* at 19. As stated above, E.F. had 11 different placements from January 2021 to January 2022. *Id.* at 30. Eventually, the Children, who had been placed together, were separated as a result. *Id.* at 48.

Z.G., who was 19 months old, "play[ed] around in the room" during visits. *See* N.T. at 29. Ms. Roscoe believed that "because he's a baby, [Mother's behavior did not] affect him too much." *Id.* Z.G. has remained in the same placement since the Children were separated. *Id.* at 48. Nevertheless, given the multiple placement disruptions, it was difficult to implement necessary services. *Id.* Furthermore, due to E.F.'s instability, sibling visits had not been instituted as of the date of the hearing. *Id.*

Ms. Roscoe's supervisor and former CUA case manager supervisor, Tommy SanMiguel, was assigned to the Children's case from May of 2021 through January 2022. N.T. at 52. He likewise testified that Mother's behaviors persisted with unsuccessful redirection: "Every month, there was an issue with the case, that we decided to [have the CUA staff supervise the visits,] because clearly [the] workers were overwhelmed with the case." *Id.* at 53. Mr. SanMiguel also described an unsuccessful attempt during a visit in November of 2021 to provide Mother a letter with protocols for supervised visitation. *See id.* at 56. Mother refused to accept the letter and, in the Children's presence, had a 30-minute "outburst," in which she stated "she's not willing to follow the rules[ and does not] care about the rules," "curs[ed] out" Mr. SanMiguel, and used a derogatory racial slur. *Id.* at 56-57. Mr. SanMiguel believed "the only way that we could do [visitation] would be virtually." *Id.* at 60.

Mother testified that during visits, she never threatened anyone, and no CUA staff or anyone supervising the visits ever redirected her or told her she was acting inappropriately. N.T. at 67, 69. Instead, "the only time [she] was approached" by a staff person was when Mr. SanMiguel attempted to give her a letter about the visits, but she refused because it "was inappropriate" and interruptive of her time with the Children. *Id.* at 68. Mother denied asking E.F. for information about the foster parents or for pictures of Sibling. *Id.* at 71. Mother also testified Ms. Roscoe "sat outside" her home in a red car and, during one visit, threatened that the Children would be adopted and Ms. Roscoe's "baby dad . . . would make [Mother] disappear." *Id.* at 72-73.

Following the testimony, the trial court found Mother posed a grave threat[7] to the Children and "any contact, even supervised, remote contact would be detrimental to their health." N.T. at 84. The court accordingly suspended all visitation pending further order. The court's written orders also prohibited Mother's remote contact with the children. Permanency Review Orders, 1/25/22, at 2. The court maintained the Children's permanency goals of reunification.

Thereafter, on February 23, 2021, Mother *pro se* filed a timely notice of appeal at each docket, pertaining to each child, along with Pa.R.A.P.

---

[7] The trial court used the term, "existential threat," but its on the record discussion and opinion support a finding of a "grave threat." *See* N.T. at 84; Trial Ct. Op. at 42-44.

1925(a)(2)(i) concise statements of errors complained of on appeal.[8]   This

Court *sua sponte* consolidated the two appeals on May 18, 2022.

### III.  Statement of Questions Involved

On appeal, Mother raises the following issues for our review:

1. Whether the trial court erred as a matter of law and abused its discretion by not making reasonable efforts to maintain the relationship [between] Mother and Children [and] to preserve the parental relationship insofar as:

> a. The last time Mother saw Children was back in November of 2021, even though the visits were not officially suspended until the January 2022 court date.

> b. Mother is never given access to any information about the Children, such as medical information.

2. Whether the trial court erred, abused its discretion and accepted an accusation as fact by introducing evidence that is currently pending under another case where Mother has not been

---

[8] As the trial court docket indicated Mother was still represented by private counsel, Edward Wiley, Esquire, this Court entered Attorney Wiley on our dockets as counsel. *See Commonwealth v. Ellis*, 626 A.2d 1137, 1139 (Pa. 1993) (there is no constitutional right to hybrid representation at trial or on appeal).   On March 31, 2022, this Court directed Attorney Wiley to file amended Rule 1925(b) Statements by April 11th.  Soon thereafter, Kimberly Keenen, Esquire, entered her appearance for Mother in the trial court.  As it was unclear who represented Mother on appeal, this Court entered an order on April 6th directing both Attorney Wiley and Attorney Keenen to respond as to Mother's representation.  No responses were received.  In fact, Attorney Wiley never responded to this Court's orders nor withdrew from these appeals.

Nevertheless, as these appeals are designated Children's Fast Track appeals and amended concise statements were required to be filed by Mother's counsel, on April 20, 2022, this Court directed Attorney Keenen to file amended concise statements by April 27th.  Attorney Keenen complied, and has filed the appellate brief on behalf of Mother.

convicted and repeatedly asserted her innocence in a case of her other minor child accidentally falling insofar as:

> a. Suspension of visits of Children with Mother appear to be due to Mother's pending criminal trial related to other minor child — trial is coming up in October.

> b. Trial court is moving towards termination of parental rights, but Mother denies the charges levied against her and intends to fight the criminal allegations at trial. She enjoys her constitutionally guaranteed right to silence in the face of these accusations. Should Mother be required to testify in this proceeding prior to her criminal trial, those rights would be violated.

3. Whether the trial court erred and abused its discretion in determining the best interest of the Children would best be served by terminating visitation in light of the evidence regarding the parent child bond and the detrimental effect of severing the bond between the minor [C]hildren and [M]other . . . insofar as:

> a. Children have good relationships with Mother and enjoy seeing her.

> b. The longer it goes without Mother having any contact with Children, that much more difficult [sic] it will be for Children to continue to develop a bond with [M]other.

Mother's Brief at 4-5.

Mother's third issue mistakenly refers to the termination of her parental rights. Mother's rights have not been terminated, and the order underlying this appeal indefinitely suspended her visitation. Furthermore, we note Mother presents all these issues together under one heading in the argument section of her brief — "[DHS] failed to establish by clear and convincing evidence Mother's visits should be suspended." *Id.* at 9-10. We remind Attorney Keenen: "The argument shall be divided into as many parts as there

- 16 -

are questions to be argued; and shall have at the head of each part . . . the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent." *See* Pa.R.A.P. 2119(a).

#### IV. Standard of Review & Relevant Law

We first observe our standard of review in dependency cases:

> [W]e must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

*Interest of L.B.*, 229 A.3d at 977 (citation omitted).

In dependency cases, where reunification remains the family service goal, parental visitation will not be denied or reduced unless it poses a grave threat to the child. *In re C.J.*, 729 A.2d 89, 95 (Pa. Super. 1999). *See also id.* at 94 ("[B]ecause of the constitutionally protected liberty interest parents have to such visitation, parental visitation is usually not denied or limited unless visitation with the parent poses a grave threat to the child."). In such circumstances, the "grave threat" standard, and not the child's best interests, applies. *Id.* at 96. "The policy underlying the 'grave threat' standard reflects the desirability of continuing contact between the parent and the child. It

underscores the importance of each parent's maintaining a meaningful and sustaining relationship with the child." *Interest of L.B.*, 229 A.3d at 976 (citation omitted).

This Court has explained:

The "grave threat" standard is met when the evidence clearly shows that the parent is unfit to associate with his or her children; the parent can then be denied the right to see them. This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child.

*Interest of C.B.*, 861 A.2d 287, 293 (Pa. Super. 2004) (citations omitted).

When making this determination, we must take into consideration the express legislative policy of preservation of the family. [*See*] Juvenile Act, 42 Pa.C.S. § 6301 *et seq.* Therefore, the trial court is required to consider options such as structured visitation with the aid of an agency; only where there are no practicable visitation options can visitation be denied. . . .

*Interest of Coast*, 561 A.2d 762, 772 (Pa. Super. 1989) (*en banc*) (some citations omitted).

## IV. Suspension of Visitation

Mother avers the trial court erred in suspending her visitation rights. She reasons: (1) although her visitation was suspended in January 2022, she has not seen the Children since November 2021 and had not been provided any school or medical information about the Children; and (2) the court's order "appear[s] to be due to Mother's pending criminal trial related to" another child, but "Mother denies the charges levied against her and intends to fight

the criminal allegations at trial."[9]  Mother's Brief at 9-10.  Mother also maintains: (1) "[s]he has never failed to perform parental duties[, her] love for her children has been evident[;]" (2) "she has gone above and beyond to complete everything that has been asked of her[;]" (3) she "has been consistent with mental health treatment, attending therapy, anger management classes[, and visitation,] she is employed, and her home is appropriate."  *Id.* at 9.  We conclude no relief is due.

First, we note Mother fails to cite to the place in the record supporting her insistence that she "has been consistent with mental health treatment, attending therapy, [and] anger management classes."  *See* Pa.R.A.P. 2119(c) (if reference is made to the evidence, the argument must set forth the place in the record where the matter referred to appears); Mother's Brief at 9.  At the hearing, Mother offered no testimony or evidence about her compliance with mental health and other treatment.  Meanwhile, DHS averred it was unable to verify Mother's mental health treatment after May of 2021.  *See* Trial Ct. Op. at 25.

_____

[9] Mother also avers, "She enjoys her constitutionally guaranteed right to silence in the face of these accusations.  Should Mother be required to testify **in this proceeding** prior to her criminal trial, those rights would be violated."  *See* Mother's Brief at 10 (emphasis added).  This statement is not entirely apparent; Mother did testify at the underlying January 25, 2022, emergency hearing on DHS' visitation motion.  We note Mother may be referring to the February 3, 2022, termination hearing, *see id.* ("[T]he Trial Court is moving towards termination of parental rights."), but Mother does not specify so.

Critically, Mother fails to address the extensive testimony, as well as the trial court's findings, as to her escalating and inappropriate conduct at visitation and with DHS and CUA staff, which directly affected the quality of the visits, the Children's emotional health and safety at the visits, and the frequent changes in the Children's placement. The trial court found both Ms. Robinson and Ms. Roscoe testified credibly, while specifically finding Mother was not credible. Trial Ct. Op. at 35, 38, 43. At the conclusion of the hearing, the court stated Mother was a "pathological liar," who may not be able to "distinguish between reality and her own subjective inventions as to [her] interactions" with the caseworkers. N.T. at 84.

Meanwhile, we conclude the record supports the trial court's finding that Mother's visitation should be suspended because it poses a grave threat to the Children. The court reasoned:

> The totality of the record reflects that the Children have experienced instability during the numerous confidential placements. Mother's aggressive, attacking, disruptive behaviors and unfounded complaints have contributed to the Children's instability. Mother specifically instructs E.F. not to cooperate and obey the foster parents and spends visitation time questioning the Child about the foster families. E.F. has had 11 different placements during her one-year placement and needs trauma therapy[;] however, Mother will not sign consents. E.F. is 9 years old and needs stabilization and a safe, therapeutic environment.
>
> Throughout the continuing life of this dependency case, the Court has made various attempts to restructure visitation, in many forms, from line of sight/line of hearing supervised visits at DHS to weekly virtual supervised line of sight/line of hearing visitation. DHS and CUA team members have made various attempts to supervise visits, all to no avail. All forms of visitation have thus far been unsuccessful due to Mother's behavior during

- 20 -

the visits and the filing of unfounded complaints and grievances. After the visits, E.F.'s behavior with the foster parents is disruptive and she repeats what Mother has told her that she does not have to obey or listen to the caregivers.

This Court heard credible, persuasive testimony from the CUA managers and supervisors regarding Mother's behavior and actions and gives their testimony great weight. Mother's testimony, on the other hand, is not credible and holds no weight with this [c]ourt. Therefore, this Court finds the evidence presented by DHS is clear and convincing that Mother's visitation is contrary to the safety or well-being of the Children and would present a grave threat to them at this time.

Trial Ct. Op. at 42-43. We reiterate the undisputed testimony by Ms. Robinson, Ms. Roscoe, and Mr. SanMiguel, that due to Mother's conduct, continued supervised line of sight/line of hearing visitation was not possible. N.T. at 18, 42, 60.

We conclude the trial court did not abuse its discretion in finding visitation would pose a grave threat to the Children, and thus indefinitely suspending Mother's visitation.

## V. Conclusion

For the foregoing reasons, we affirm the orders of the trial court suspending Mother's visitation.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/30/2022